Syllabus.

## GEORGE E. HAWTHORN *et al.*

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa November 20, 1883.*

1. BUTTER AND CHEESE FACTORIES—*constitutionality of the act of 1883.* The act of June 18, 1883, requiring the operators of butter and cheese factories on the coöperative plan to give bonds, etc., is not in contravention of section 6, article 2, of the Bill of Rights, which declares that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall be inviolate." Such act is but a proper exercise of the police power of the State for the protection of persons intrusting their property to the manufacturer, from fraud and wrong.

2. CONSTITUTIONAL LAW—*legislative power—generally.* The State, through the General Assembly, has supreme legislative power, except so far as it is limited by its constitution, or such as has been delegated to the general government, or its exercise has been limited by the Federal constitution.

3. SAME—*police power of the State.* The police power of the State, when exercised by the legislature in the passage of laws for the protection of life, liberty and property, or laws for the general welfare, has no limitations or restrictions, except such as are found in the constitution.

4. SAME—*laws regulating and in restraint of trade.* The fact that a law regulates trade or any business, or in some degree operates as a restraint on the same, does not render it obnoxious to any constitutional provision. The legislature, for the safety, security and welfare of society, may control the acts of the governed even as to the time and manner of performing labor, and in the manner in which persons shall use their property, to prevent injury to others.

5. SAME—*presumption in favor of validity of laws.* Where a law is found upon the statute books, the presumption is that it conforms to the constitution, and that it is a valid enactment, and the courts will not hold it unconstitutional in case of doubt. To authorize the court to hold a law unconstitutional, its repugnance to the organic law must clearly appear.

6. SAME—*conferring judicial power upon ministerial officers—as, authorizing clerks to approve bonds.* A statute conferring power on the circuit clerk or recorder of deeds to determine the sufficiency of bonds required to be given, is not unconstitutional, as conferring judicial powers on such officers. Such power has been recognized as ministerial.

7. SAME—*special legislation—as applying to a class of persons.* A statute is not obnoxious to the constitutional objection that it is not a general law because it applies to a class of persons. It is a general law if it applies

to all persons in the State similarly engaged. A law is general, not because it embraces all of the governed, but that it may, when they occupy the same position of those who are embraced in its terms.

8. SAME—*whether subject of act is expressed in its title.* The act of June 18, 1883, entitled "An act to require of butter and cheese factories on the coöperative plan to give bonds, and to prescribe penalties for the violation thereof," is not obnoxious to the objection that the subject is not embraced in the title.

APPEAL from the County Court of Kane county; the Hon. EDWARD E. LOVELL, Judge, presiding.

Mr. CHARLES WHEATON, and Mr. R. N. BOTSFORD, for the appellants.

Mr. JAMES MCCARTNEY, Attorney General, Mr. HIRAM H. CODY, and Mr. T. E. RYAN, for the People.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The prosecuting attorney of Kane county, at the June term, on the 12th day of July, 1883, filed in the county court of that county an information against appellants, for failing to file the bond required by the act of the 18th of June, 1883. (See Sess. Laws, p. 54.) It is not disputed that appellants were operating a butter and cheese factory in that county. It appears they received the milk of the farmers of the neighborhood, manufactured from it butter and cheese, for which they retained four cents a pound for butter, and two cents a pound for cheese, after selling it, and the balance was to be divided among those who furnished the milk, as we suppose, to each in proportion to the amount furnished and manufactured. Appellants sold in market all the butter and cheese they manufactured, and divided the proceeds as stated. It is admitted they did not give the required bond, and that appellants continued to operate their factory in the same manner after as before the time elapsed for the statute to become operative. On the trial in the court below, defendants asked

the court to hold as a legal proposition that the law was passed in violation of the State constitution, but the court refused to so hold, and found the defendants guilty, and after overruling a motion for a new trial and in arrest of judgment, rendered a judgment for a fine of $200, and defendants appeal to this court, and urge a reversal.

The questions argued by counsel are: First, whether or not the General Assembly did transcend its constitutional power in enacting the law; and second, if it did not, whether, under the constitution, the title of the act is sufficient to sustain the law. These are the legal propositions arising on the record, and presented for decision.

There can be no doubt that the State legislature possesses supreme power, except so far as it is limited by the constitution or foundation of government, or such power has been delegated to the general government, or its exercise has been limited by the Federal constitution. A government, as such, can not exist without the governing or sovereign power adequate to the protection of the people from wrong and oppression. This supreme or sovereign power to enact laws has been confided to the representatives of the people, composing the General Assembly, and had there been no restrictions or limitations on the exercise of the legislative power, the people, through their representatives, would have been uncontrolled in the exercise of the legislative function. But for such limitations the legislature would have been supreme in the exercise of legislative power, as much so as the ruler in any kind of government. The sovereign or governing power of all governments is the same in character, but in liberal governments the exercise of a portion of the governing power is restrained to secure rights and privileges to the governed. These restrictions and limitations on the different branches in our system of government are alone found in our constitutions of government. The first section of article 4 of our constitution provides, that "the legislative power shall be vested in a Gen-

eral Assembly, which shall consist of a Senate and House of Representatives, both to be elected by the people." Had there been no restriction by other portions of that instrument, and no previous delegation of the legislative power to the general government, or any limitation of the power by the constitution, this delegation of the legislative power to our General Assembly would have been plenary, and without restraint, except its own will and sense of duty. But to restrain such power, and to secure the citizen in the enjoyment of such rights as are conceded to him, or he has been left in possession of by government, these limitations and restrictions are imposed by fundamental law.

It is said by Lord COKE: "The power and jurisdiction of Parliament is so transcendent and absolute that it can not be confined, either for persons or causes, within any bounds; and of this high court it may be said: '*Si antiquitatem spectes, est vetustissima; si dignitatem est honoratissima; si jurisdictionem est capacissima.*' It hath sovereign and uncontrolled authority in the making, confirming, enlarging, restraining, abrogating, repealing, reviving and expounding of laws concerning matters of all possible denominations, ecclesiastical or temporal, civil, military, maritime, or criminal, this being the place where that absolute despotic power, which must in all governments reside somewhere, is entrusted by the constitution of these kingdoms. All mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal. * * * It can change and create afresh even the constitution of the kingdom, and of Parliaments themselves. * * * It can, in short, do everything that is not naturally impossible; and therefore some have not scrupled to call its power (by a figure rather too bold) the omnipotence of Parliament. True it is, that what Parliament doth, no authority upon earth can undo." 4 Inst. 36; Cooley's Const. Lim. (1st ed.) 85.

20—109 ILL.

Under our institutions this sovereignty or transcendent power of government resides in or with the people, and may be exercised in the manner they have provided by the constitution. The people can make and unmake constitutions. They can, within constitutional restrictions imposed by the Federal constitution, delegate the powers of government to whom and as they please. They can withhold or intrust it, with such limitations as they choose. They, in our State governments, have delegated the power to different departments, and have virtually withheld the exercise of the legislative power to themselves, inasmuch as, through their representatives, elected at short intervals, they carry into effect their will, formulated into laws, to be enforced by the other departments. Government would be but a rope of sand, that did not possess sovereignty, with its attributes and incidents,—and that indispensable sovereignty must rest in a body large or small, to have any efficiency whatever. The founders of our system of government, in their wisdom, entrusted that transcendent sovereign power to the people, to be exercised by them through their representatives, under the limitations or restrictions of our constitutions of government. Judge Cooley says, (Const. Lim. 85,) that in considering the legislative powers of our States it is natural that we should recur to those possessed by the British Parliament, upon which, in part, our legislatures have been modeled, and from which we derive our legislative usages and customs, or parliamentary common law, and the precedents upon which legislative power is based. He also says, it is natural that we should incline to measure such power in this country by the power of a like department in Great Britain; but we should not be misled, because we must bear in mind that in Parliament rests the sovereignty of the country, and it may therefore exercise all governing power, while complete sovereignty is not vested in ours because they are hedged about with limitations, imposed in express terms or by implication.

Where a law, therefore, is found on the statute books, the presumption is that it conforms to the constitution. This presumption arises from the fact that each member of both houses who pass the law, and the chief executive who has approved it, are under the same obligation to support the constitution as are the courts. Having performed all acts necessary to the adoption of the law, we must presume they acted in view of the constitution and all of its limitations. For these reasons the courts never interfere to declare a law unconstitutional in case of doubt. To authorize such action by the court, it must be clear the law violates some provision of the organic law. When, therefore, a law is challenged as unconstitutional, we must be able to turn to the provision of the instrument which prohibits the legislature from its enactment, and the repugnancy must clearly appear. These doctrines and constitutional principles are distinctly announced by this court in the cases of *Field* v. *The People,* 2 Scam. 79, *The People* v. *Salomon,* 51 Ill. 49, *The People* v. *Marshall,* 1 Gilm. 672, *Lane* v. *Dorman,* 3 Scam. 238, *Bruce* v. *Schuyler,* 4 Gilm. 221, *Mason* v. *Wait,* 4 Scam. 127, and *The People* v. *Reynolds,* 5 Gilm. 1, and coincide with the decisions of almost, if not all, courts.

Then, in this case, what provision of our constitution has been violated? No provision has been pointed out, except section 6, article 2, of our Bill of Rights. It provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall be inviolate." This law in no sense invades any of those rights. It does not require the seizure of any person or his property, nor does it require the invasion of any one's house, nor does it require a search of his papers, reasonable or unreasonable. We are therefore unable to see that this law in anywise violates that provision. It is true the act does require the manufacturer, at the end of each month, "to make, acknowledge, subscribe and swear to a report, in

writing, showing the amount of products manufactured, the amount sold, the prices received therefor, and the dividends earned and declared for the third month preceding the month in which the report is made," and to file a copy of the same with the clerk of the town or precinct in which the factory is located. This, in terms, falls far short of a conflict, in terms, with that constitutional provision, nor does it conflict in spirit. Here the manufacturer receives the property of a portion of the community to manufacture, sell, and return to them the amount received, over and above his charges for manufacturing the material into the article prepared for the market. This provision is clearly intended to protect the persons intrusting their property to the manufacturer, from wrong and fraud. This is not an unusual exercise of power. It has always been required that executors and administrators intrusted with the property of estates shall file in a public office a full and complete account of their actions with reference to the property thus intrusted to their management and control. This law only requires the manufacturer to render an account of his management of other people's property. He holds himself out as a factor for the management and sale of other people's property, and in that respect is like a public warehouseman.

It is also objected that the legislature had no power to require the manufacturer to give the bond required to enable the manufacturer to commence or continue business, in this mode, in an innocent and lawful business. The business of selling liquor by saloon-keepers is lawful, unless prohibited by law, and all persons might carry on the traffic; but the law has imposed as a condition that all persons shall execute a bond that they will not violate the law, before engaging in that traffic, and such a bond is intended as a security for damages he may inflict on persons injured by violating the law. The bond in this case is intended to secure those who intrust their property to the keeping of the manufacturer,

against fraud or misappropriation by him of their property, just as the executor or administrator is required to give bond to secure those entitled to the funds of the estate, or the saloon-keeper to give security that he will not violate the law, and thus inflict injury on his customers.

It is urged that this is an unheard of species of legislation,—that the past has furnished no precedent for the law. If this should be conceded to be true, that would not of itself render the law unconstitutional.  Government was organized, and is supported, to afford protection to the governed against wrong and oppression, and in its organization ample power was conferred on the legislative branch to afford such protection.    That branch of the government holds, so to speak, a vast reservoir of legislative power never yet exercised, because the exigencies have not arisen requiring it to be exerted; but with our wonderful increase of population, advancing civilization, and increase and complication of business, that reserved power will certainly be called into action.    The constitution has not limited the exercise of legislative power to such enactments as have hitherto been passed.    To so hold would be to embarrass good government, and would prove highly injurious, if not destructive.

But it is insisted that it restrains and embarrasses business.    If that were conceded to be true, what provision of the constitution forbids the legislature from exercising the power?    We are aware of none.    Most, if not all, of the States in the Union have required that persons in almost every species of business should procure and pay for a license to enable them to pursue the calling.    Nor, so far as we are aware, has the constitutionality of such laws ever been questioned. They were undeniably a regulation, if not a restraint, on trade, and yet the power was clearly legislative, and properly exercised.    It may be said that was a revenue measure. Admit it, and where is the distinction between the exercise of legislative power to raise revenue, and to protect the people

from wrong, oppression and fraud? That body is fully empowered and charged with the duty of performing both acts. Nor are the courts invested with a particle of power to review or control the acts of that body, so long as it keeps within the limits of its constitutional powers. With the wisdom of its acts the courts have no concern, so long as it does not transcend its powers. Where an act of the legislature is challenged in the courts as unconstitutional, all the court can rightfully do is to determine whether that body had the power to pass the enactment, and if found to be within the scope of its power, they can not interfere. To do so would violate the third article of the constitution, which divides the powers of government, and prohibits each branch from exercising the powers of either of the others. It has been held that the legislature has the constitutional power to control the acts of the governed, even as to the time and the manner of performing labor, by requiring all persons to refrain from labor or business on Sunday, and the manner in which individuals shall use their property, to prevent injury to others; and such power, so far as we are informed, has seldom been challenged, and always sustained.

A number of cases arising under city ordinances have been referred to by counsel as conclusive that this law is unconstitutional. In none of the cases referred to had the General Assembly, in express terms, granted to the municipality the powers that were exercised. Such was the case in *City of Clinton* v. *Phillips*, 58 Ill. 102. There the city authorized the sale of the liquor, but made it penal to fail to make a statement, at designated times, of sales, their purposes, the time, and the persons to whom sold. The case of *Toledo, Wabash and Western R. R. Co.* v. *City of Jacksonville*, 77 Ill. 39, was a city ordinance requiring the useless act of the railroad company keeping a flagman at a crossing where there was no danger to persons. They are unlike this case. In none of the cases referred to was the law intended to protect

the public from wrong and fraud, but the charters of those cities only conferred the power to adopt reasonable ordinances, and it was held they were not such, and were held inoperative for that reason. Nor had the legislature required that such ordinances should be adopted. The corporate bodies, in those cases, were only empowered to pass reasonable ordinances, and they were, in those cases, held to be unreasonable, and therefore void.

It is said that this is not a police regulation. That may be true, if the term were confined merely to the protection of the health and morals of the people. The term has a much more comprehensive meaning. It has been defined to be: "The regulation and government of a country or city, so far as it regards its inhabitants." Also, "The laws, ordinances and other measures which require the citizens to exercise their rights in a particular form." It is true there are other and more limited meanings of the word, and when it is said that there are other limits to its exercise than the constitution, it has reference to the more restricted meaning of the term. When exercised by the legislature, in its more comprehensive sense, in the passage of laws for the protection of life, liberty and property, or laws for the general welfare, the only limitations to restrain its action must be found in the constitution. This, in the larger sense, is an exercise of the police power by the General Assembly, and falls fully within legislative power, and sustains the enactment under consideration.

It is urged that the law is not general, but applies to the private patrons of those factories, to secure them against the acts of their commission merchant or milk broker, and is class legislation. We fail to perceive that this is not a general law. It embraces all persons in the State similarly engaged. If all laws were held unconstitutional because they did not embrace all persons, few would stand the test. The law defining the crime of horse stealing is intended for the

protection of the owners of such animals, and they form a class; but a large portion of persons in the State do not own such animals,—and shall it be said that law is void because it is class legislation? It has never occurred to any one to urge such an objection against the law. The same may be said of most, if not all, other laws, however general their character. A law is general, not because it embraces all of the governed, but that it may, from its terms, when many are embraced in its provisions, and all others may be when they occupy the position of those who are embraced.

It is urged that the law is unconstitutional because it confers the power on the clerk or the recorder of deeds to determine whether the bond required to be filed is good and sufficient, and to approve the security. It is claimed that this is an attempt to confer judicial power on ministerial officers. Such power has been conferred upon, and exercised by, such officers, since the organization of the State government, in cases of attachment, replevin, and most official bonds, yet no one seems to have ever supposed the laws conferring such power, and its exercise by such officers, were unconstitutional. The power has ever been recognized as ministerial.

It is objected that the act does not, in its title, conform to the requirements of the constitution. The title is: "An act to require of butter and cheese factories on the coöperative plan to give bonds, and to prescribe penalties for the violation thereof." The enacting clause prohibits the carrying on, or operating or conducting, the business of manufacturing butter or cheese on the "coöperative or dividend plan, until such person or persons, company or corporation, shall have filed with the circuit clerk, or recorder of deeds, * * * a good and sufficient bond," etc. It is claimed that the coöperative plan is different from the dividend plan. The portion of the constitution supposed to be violated is a clause of the 13th section of article 4, and is this: "No act here-

after passed shall embrace more than one subject, and that shall be expressed in the title." It is claimed that the title does not express the subject of the body of the act. The term "coöperative" is defined to be, "promoting the same end; helping; acting together to accomplish the same end." This being the meaning of the word, it seems to describe the business transacted by appellants and those who furnished the milk to be manufactured. They all promoted the same end, and hence coöperated,—the farmers by furnishing the milk, and appellants by manufacturing and selling the product. Whatever the factory be locally called, it is manifestly operated on the coöperative plan. This establishment being within the meaning of the term "coöperative" plan of manufacturing butter and cheese, it is found in both the title to and in the body of the act, and the constitutional requirement is fulfilled.

It is, however, urged, that the body of the act embraces two distinct kinds of factories, conducted on essentially different plans, and one of them is not named in the title. We think a fair construction is, that the terms in the body of the act, "coöperative or dividend plan," are used as convertible terms. But if they are not, and they imply two plans, then both are embraced in the body of the act, and as the coöperative plan is named in both the title and the enacting clause, the coöperative plan is embraced in both, and we have seen that appellants were conducting their business on the coöperative plan.

Finding no error in the record, the judgment of the court below is affirmed.

*Judgment affirmed.*