No. 20,234.

THE STATE OF KANSAS, ex rel. S. M. BREWSTER, as Attorney-general, etc., *Plaintiff*, v. J. C. MOHLER, as Secretary of the State Board of Agriculture, etc., and W. S. PAYNE, *Defendants;* L. H. POWELL et al., *Intervenors.*

OPINION ON REHEARING.

SYLLABUS BY THE COURT.

1. FACTORS—*Regulation—Constitutionality of Statute.* Chapter 371 of the Laws of 1915, which requires all commission merchants who sell farm produce for resale to hold a license issued by the secretary of the state board of agriculture and to give bond to insure fair dealing with their consignors, is not unconstitutional as discriminatory or class legislation.

2. SAME—*Must Account to Consignors—Police Power.* An act which requires commission merchants to make and furnish to the consignors of goods entrusted to them for sale on commission an accurate and detailed account of all. the pertinent facts relating to such sales on commission is a valid exercise of the state's police power, and the expense of making such a record and account is a proper charge upon the business and not confiscatory.

3. SAME—*Supervision of—Administrative Function.* The powers of granting and withholding or revoking licenses to commission merchants, of supervising their dealings with their consignors, of examining their solvency, and of exacting from them bonds to insure their faithful accounting and payment for goods consigned to them are administrative and not judicial.

4. CONSTITUTIONAL LAW—*Statute Confers No·Corporate Power.* Chapter 371 of the Laws. of 1915 confers no corporate powers on the state board of agriculture.

5. SAME — *Statute Valid — Interstate Commerce.* Chapter 371 of the Laws of 1915 is not invalid as an undue interference with interstate commerce.

6. SAME — *Intrastate Commerce Regulated — Interstate Not — Statute Valid.* An act of the legislature regulating intrastate commerce is not invalid because competitive interstate commerce in the same territory is not similarly regulated by the federal government.

7. SAME — *Title of Statute Sufficient — Act General.* Chapter 371 of the Laws of 1915, entitled "An act in relation to the sale of farm produce on commission," contains only one subject. That subject is clearly expressed in its title, and the act is subject to no infirmity as special legislation.

30—98 KAN.

8. SAME — *Penalties — Not Excessive or Unusual.* The penalties prescribed for violations of the act, (*a*) revocation of license for various relevant delinquencies, and (*b*) fines of from $10 to $500 for misdemeanors defined therein are not excessive or unusual.

9. SAME—*Acts of Administrative Officer—Judicial Review—Certiorari.* The legislature has full power to provide for a judicial review of the acts of an administrative officer, and to prescribe the procedure for such review. The writ of certiorari and its statutory adaptation to a review of the official acts of the secretary of the state board of agriculture, under chapter 371 of the Laws of 1915, violates no constitutional principle.

Original proceeding in mandamus. Opinion filed June 29, 1916. Writ allowed.

*S. M. Brewster,* attorney-general, *S. N. Hawkes,* and *John L. Hunt,* assistants attorney-general, for the plaintiff.

*J. C. Mohler,* of Topeka, *pro se.*

*Edwin D. McKeever,* of Topeka, *Earl Blake, W. A. Ayres,* and *C. A. McCorkle,* all of Wichita, for defendant W. S. Payne.

*J. Graham Campbell,* and *Ray Campbell,* both of Wichita, for the intervenors.

The opinion of the court was delivered by

DAWSON, J.: This action is brought to test the validity of chapter 371 of the Laws of 1915, entitled "An act in relation to the sale of farm produce on commission." The state asks for a writ of mandamus to compel the secretary of the state board of agriculture to pay into the state treasury certain license fees which he has received from certain commission merchants, paid by them under protest and under coercion of the act.

The secretary answers that he is ready and willing to execute this law and to pay over the fees when assured that he will incur no personal liability in so doing, and he asks that the parties interested in the fees paid under protest be brought into court that the whole controversy be fully adjudicated.

W. S. Payne, a commission merchant of Wichita, who has paid his license fee under protest, was impleaded and answered setting up many constitutional objections to the act. Some thirty grain dealers of Wichita who receive consignments of grain from country elevators and sell the same on

commission intervene and likewise challenge the constitution-ality of the act.

The act under consideration provides that all persons who sell farm products on commission, except sales to the ultimate consumer, must have a license issued by the secretary of the state board of agriculture. The license costs ten dollars and is effective for one year, subject to revocation by the secretary, after investigation, for unfair or improper business dealings. A judicial review of the acts of the secretary is provided. The licensee must give a bond to insure his fair dealing with his consignors. The secretary may maintain an action on this bond in a proper case. Every commission merchant must keep a complete record of all consignments received and sold by him, with the name of the consignor, date of receipt, kind and quality of the consignment, the price received, name and address of person to whom the goods are sold, and the items of expense, and this record must be forwarded to the consignor within forty-eight hours after the transaction unless otherwise agreed. Such a record shall also be kept by the commission merchant for one year, and shall be open to the inspection of the consignor and the secretary of the state board of agriculture or their agents.

Certain relevant offenses are defined by the act, all designed to standardize the business of commission merchants in consonance with honesty and fair dealing.

The chief objections to the act may be thus summarized:

(*a*) The act is meddlesome, discriminatory and class legislation, and so burdensome that it will confiscate and destroy an honorable, useful and legitimate private business; (*b*) it confers judicial power on an administrative functionary; (*c*) it confers corporate power on the state board of agriculture; (*d*) it interferes with interstate commerce or unjustly burdens domestic commerce; (*e*) the title is defective and the act contains two subjects; (*f*) the act is special; (*g*) the judicial review is anomalous; and (*h*) the penalties are excessive.

Examining these points in order, the act is to be justified, if at all, as an exercise of the state's police power. It is sometimes contended that the state can not regulate private business, and that unless the business is one of public concern it is exempt from legislative interference. Probably this notion

is due to the fact that the modern American state has hitherto left private business largely to its own devices, and because the state in recent years has largely concerned itself with the regulation of business as to which the public's interest was undeniable.   Hence the elaborate statutes regulating public-service corporations.   But there can be no doubt that the state's police power may extend to private business.   Our statutes relating to registration of deeds and mortgages, the statute of frauds, the mechanic's lien law, and the like are illustrations of the exercise of the state's police power over private business.   It is also true that business which has heretofore been considered to be private may by changes and progress in the methods of its conduct be transformed into a public or quasi-public business, and this may make it desirable and even imperative that the state concern itself in its regulation and control.   Of course such regulations must be reasonable, but if they are reasonable they must be obeyed.

The business of commission merchants dealing in farm produce has grown to be one of great volume and much importance.   In its development its tendency seems to be to centralize in the larger cities, far removed from the points of origin, and where by no practical possibility can the originators of the traffic, the consignors, keep personal check on the doings of the commission merchants, who are merely the agents of the consignors.   Such a situation would seem to warrant a reasonable extension of the state's governmental power over the business.

The act does classify commission merchants, but the classification is reasonable.   It relates to all who sell farm produce on commission for resale, and this includes "agricultural, horticultural, vegetable and fruit products of the soil, and meats, poultry, eggs, dairy products, nuts and honey," but not timber, floricultural products, tea or coffee.   It practically reaches all the important and useful products of farm and truck garden. It specifically exempts matters of little consequence to the Kansas producer.   If, as argued, it also exempts live stock, that too, is a reasonable exemption, since live stock is almost invariably shipped in carloads and is so valuable as to justify the producer or shipper in the expense of accompanying his shipment to market and personally supervising the fidelity of the

commission merchant who makes the sale for him or in making the sale himself. As modern business is now conducted, it is practically impossible for the ordinary farmer or fruit producer or truck gardener to market his own products without the agency of the commission merchant.

Nor do the exactions of the statute seem unduly burdensome. It exacts a license of $10 per annum. That fee is not onerous. It requires a bond to insure the commission merchant's fidelity and the payment of his obligations. This is in accord with the general tendency of modern business, to relieve it from the uncertainty of fraud or insolvency. It requires the merchant to account and report promptly and completely to the consignor. Perhaps this has always been the law, for what is the relation of consignor and commission merchant but that of principal and agent, and what is this statutory requirement to account and report but the common-law duty of faithful and full disclosure to his principal of all the agent's doings? Illustrations are submitted in affidavits showing how onerous, burdensome, and expensive it would be to make a detailed account of the sales of a commission merchant. Thus a barrel of garlic is usually sold in small quantities, the remainder being kept in cold storage until called for. A carload of onions containing 470 crates is disposed of by the commission merchant to perhaps four hundred different retail merchants. A barrel of radishes is usually sold in bunches of a few dozen. Many such illustrations are given, and while they do show that a strict compliance with the act will necessitate a good deal of bookkeeping, we can not but marvel how commission merchants have kept track of all these details hitherto. Probably the legislature was convinced that they did not keep accurate accounts of these innumerable transactions—not through willful breach of faith—but because it was not humanly possible for a man's memory to stand such a strain, and hence the legislative determination that the memory method, or whatever method it was, should be superseded by an accurate and detailed system of accounting. If this occasions an added expense to the business, the traffic will have to bear it.

The supreme court of Minnesota in a well-considered case upheld a similar statute for the licensing and bonding of com-

mission merchants who sold agricultural products and farm produce. (*State ex rel. Beek v. Wagener*, 77 Minn. 483, 491, 80 N. W. 633, 46 L. R. A. 442.) In *Hawthorn et al. v. The People*, 109 Ill. 302, 50 Am. Rep. 610, the supreme court of Illinois upheld a statute requiring operators of butter and cheese factories on the coöperative plan to give bonds for faithful accounting of property for manufacture. In that case the court said:

"It is true the act does require the manufacturer, at the end of each month, 'to make, acknowledge, subscribe and swear to a report, in writing, showing the amount of products manufactured, the amount sold, the prices received therefor, and the dividends earned and declared for the third month preceding the month in which the report is made,' and to file a copy of the same with the clerk of the town or precinct in which the factory is located. This, in terms, falls far short of a conflict, in terms, with that constitutional provision, [Illinois Bill of Rights] nor does it conflict in sprit. . . . This is not an unusual exercise of power. It has always been required that executors and administrators intrusted with the property of estates shall file in a public office a full and complete account of their actions with reference to the property thus intrusted to their management and control. This law only requires the manufacturer to render an account of his management of other people's property. He holds himself out as a factor for the management and sale of other people's property, and in that respect is like a public warehouseman. . . . It is urged that this is an unheard-of species of legislation—that the past has furnished no precedent for the law. If this should be conceded to be true, that would not of itself render the law unconstitutional. Government was organized, and is supported, to afford protection to the governed against wrong and oppression, and in its organization ample power was conferred on the legislative branch to afford such protection. That branch of the government holds, so to speak, a vast reservoir of legislative power never yet exercised, because the exigencies have not arisen requiring it to be exerted; but with our wonderful increase of population, advancing civilization, and increase and complication of business, that reserved power will certainly be called into action. The constitution has not limited the exercise of legislative power to such enactments as have hitherto been passed. To so hold would be to embarrass good government, and would prove highly injurious, if not destructive.

"But it is insisted that it restrains and embarrasses business. If that were conceded to be true, what provision of the constitution forbids the legislature from exercising the power? We are aware of none. Most, if not all, of the states in the Union have required that persons in almost every species of business should procure and pay for a license to enable them to pursue the calling. Nor, so far as we are aware, has the constitutionality of such laws ever been questioned. They were undeniably a regulation, if not a restraint, on trade, and yet the power was clearly legislative, and properly exercised." (pp. 307-309.)

A similar act, known as the commission merchants' law, was upheld by the supreme court of Washington in *State v. Bowen & Co.*, 86 Wash. 23, 149 Pac. 330, and the discussion of the principles upon which such legislation is justified is logical and convincing, although in a later case (*State v. J. B. Powles & Co.*, [Wash. 1916], 155 Pac. 774), the court was constrained to hold the act void because of indefiniteness as to the term "commission merchant," an infirmity which does not exist in the Kansas act.

The case of *People v. Berrien Circuit Judge*, 124 Mich. 664, 83 N. W. 594, is pressed on our attention, where an act of the same nature requiring a bond for $5000 to insure the fidelity of commission merchants selling farm and garden and dairy products and live stock on commission was declared to be unconstitutional. Whatever that great court says is always read and studied with profit, but curiously enough, in that case, the particular clause or clauses of the constitution, state or federal, which the statute was held to infringe are not cited nor even hinted at. The case does not cite a single precedent of any sort; and it neither persuades nor convinces as do the decisions of the supreme courts of Minnesota, Illinois and Washington on this subject. (See, also, Freund, Police Power, §§ 296, 297.)

Does the act confer judicial power on the secretary of the state board of agriculture? Judicial power is the power to hear, consider and determine controversies between rival litigants as to their personal or property rights and must be regularly invoked at the instigation of one of the litigants. (See definitions in 4 Words & Phrases, p. 3860.) The act of 1915 does not pretend to confer such power on the secretary of the state board of agriculture. It merely confers upon him administrative power such as has become common in this state. The state charter board is given similar power to grant or withhold a charter for a bank. (*Schaake v. Dolley*, 85 Kan. 598, 118 Pac. 80.) The insurance commissioner is authorized to grant, withhold and revoke licenses to transact insurance business in Kansas. The public utilities commission is authorized to grant or deny permits to conduct a public-service business. The state board of medical registration and examination is authorized to grant, deny or revoke li-

censes to practice medicine. (*Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247.) The exercise of such power is merely the exercise of administrative discretion. If this power is abused, the courts are open to the aggrieved party, if not by some statutory review, then by the extraordinary and prerogative remedies of injunction or mandamus. And by no course of reasoning can a distinction be made between the licensing and other administrative powers conferred by this act upon the secretary of the board of agriculture and the similar broad and valid powers conferred upon the many other official boards and functionaries with which the state has provided itself for the proper and effective conduct of its governmental business.

Neither does the act confer corporate power upon the state board of agriculture. Indeed the act confers no power of any sort upon that board. The state patronizes that board as one of its principal educational agencies for the benefit and improvement of the principal business of the commonwealth—agriculture; and it has determined, happily, we think, to select the chief functionary of that board to administer this act which so closely touches the chief industry of the state. We think it unnecessary to trace the legislative history of the creation and development of the state board of agriculture, and deem it sufficient to say that it is not a corporation like a railroad or a dry goods company nor like a municipal corporation, nor do we find any grant of corporate powers to it or to its secretary in this act.

The question concerning this act's interference with interstate commerce might well be left until some specific difficulty concerning such commerce arises, for it is familiar law that no act is ever declared to be unconstitutional except where the party challenging it is directly affected and prejudiced by some specific invasion of his constitutional rights. A commission merchant's business is that of a warehouseman and sales agent. As a warehouseman, his business is subject to state control notwithstanding the goods which he handles may be commodities of interstate commerce. (*Munn v. Illinois,* 94 U. S. 113.) As a sales agent, the commission merchant is subject to state control although the commodities sold by him may be of an interstate character. (*Hopkins v. United States,* 171 U. S.

578; *W. W. Cargill Co. v. Minnesota*, 180 U. S. 452.)    Even if
it were held that the act of 1915 did not or could not apply to
·interstate commerce, the state's power over domestic or intra-
state commerce is supreme.   Certain it is that the federal gov-
ernment may not meddle with purely intrastate·business, and it
would hardly do to say that where there is a domestic business
and an interstate business of the same nature the state may not
regulate the domestic business because the federal govern-
ment does not likewise and similarly regulate the competitive
interstate business in the same territory.   To admit that would
be an end of all state government.   The point sought to be
made is merely one of the inconveniences of our dual form of
government, sufficiently compensated, however, by the innumer-
able benefits which we nevertheless enjoy under our compli-
cated governmental system.   Sad indeed would be the situation
of a poor truck gardener of the Kaw valley if he might not
apply to some state or local official, but only to some bureau in
far-off Washington, D. C., to learn whether John Doe was a
licensed and trustworthy commission merchant to whom he
might entrust his little stock of garlic and radishes for resale,
or for summary aid in bringing a recalcitrant commission
merchant to a sense of his duty.

Some other objections to the act need no discussion.   The
act relates to the sale of farm produce on commission.   It re-
lates to nothing else.   This is one subject, and the title is fairly
and sufficiently indicative of its subject matter..   The act is not
special.   It is a general act, and the classification of commission
merchants brought under its terms is logical and reasonable.
The penalties are not excessive.   Indeed, there is some ground
for the fear that the mild and modest penalties prescribed by
the act may supersede and repeal by implication some of the
state's older and more powerful and drastic statutes for the
suppression of unfair trade practices.   However that may be,
the objection to the penalties can not be sustained.

One more question should be noticed.   Section 6 of the act
reads:

*Certiorari to review.* "This action of the secretary of the State Board
of Agriculture in refusing to grant a license, or in revoking a license
granted under this article, shall be subject to review by a writ of
certiorari, and if such proceedings are begun, until the final determina-
tion the proceedings and all appeals therefrom, the license of such com-

mission merchant shall be deemed to be in full force and effect; provided, the fee for such license shall have been paid and a bond given as herein required." (Laws 1915, ch. 371.)

The remedy by certiorari is criticised as being unknown to our practice. The writ of certiorari was abolished in 1868. (Civ. Code, 1868, § 564.) It was a writ well-known to the common law. It issued out of some superior court having the full judicial power of the state directing some inferior court to certify and transmit to it the records and proceedings of a particular case for trial or correction of errors. It is still used in the federal courts and in the older states. But our legislature, which abolished the writ in 1868, had undoubted power to reëstablish it in 1915. The name and style of the writ is unimportant. Long ago this court, in conformity with the temper, of this state, established the doctrine that the substance and not the form of things is the chief object in the administration of justice. Moreover, an examination of the law of other states will show that the modern notion of certiorari is not confined to a judicial examination or review of a certified case from a *lower court.* It is used to effectuate a judicial review or give a judicial right of action from the acts or proceedings of any inferior tribunal—not necessarily from an inferior court. (6 Cyc. 740, and Note 10; 6 Cyc. 752.) The last citation appends this valuable note:

"The writ will lie to review the action of a town board in removing an assessor (*Merrick v. Arbela,* 41 Mich. 630, 2 N. W. 922); of a health board in refusing to register births as required by statute (*Matter of Lauterjung,* 48 N. Y. Super. Ct. 308); of a board of supervisors in directing an election to relocate a county seat (*Herrick v. Carpenter,* 54 Iowa, 340, 6 N. W. 574); in creating an office and increasing the salaries fixed by statute (*Robinson v. Sacramento,* 16 Cal. 208); or to set aside any wrongful, illegal, or fraudulent appropriation of public moneys (*Shields v. Paterson,* 55 N. J. L. 495, 27 Atl. 803 [followed in *Shields v. Grear,* 55 N. J. L. 503, 27 Atl. 807]); of a city council in removing a city officer (*Macon v. Shaw,* 16 Ga. 172); granting a ferry license (*Fay, Petitioner,* 15 Pick. [Mass.] 243), or to test the lawfulness of a municipal ordinance providing for the payment of an official salary (*Christie v. Bayonne,* 64 N. J. L. 191, 44 Atl. 887); and of school trustees in uniting and dividing school districts (*Miller v. School Trustees,* 88 Ill. 26; *State v. Whitford,* 54 Wis. 150, 11 N. W. 424); but it has been refused to boards of election (*Exp. Carson,* 5 S. C. 117), and of road commissioners (*Nobles v. Piollet,* 16 Pa. Super. Ct. 386) because they were not inferior courts." (p. 753.)

In *Crawford v. Scio and Webster*, 22 Mich. 405, a writ of certiorari was issued "to bring up for review . . . the proceedings of the boards of the two townships, sitting as a single joint board upon a petition presented to them for the removal of said Crawford from the office of director of fractional school district No. One, which district embraces a part of each township." (p. 406.) We only cite this case to show how the uses of certiorari have been enlarged in its progress from the land and time of Lord Coke to the land and time of Judge Cooley.

It will thus be seen that in practical operation in modern times, either by statute or by judicial enlargement of its use, certiorari will lie not alone to an inferior court but to statutory boards and officers. And surely the legislature, which has full power to prescribe jurisdiction and procedure, may grant a judicial review or a cause of action from the acts of the secretary of the state board of agriculture and in so doing the legislature may label that review or cause of action certiorari or give it any other convenient name. In *Wilson v. Price-Raid Aud. Com.*, 31 Kan. 257, 1 Pac. 587, this court said:

"The jurisdiction of the supreme court is much more limited by the constitution than that of the district court; for under the constitution, the legislature can confer upon the district court all the original and all the appellate jurisdiction which it may choose. (Const., art. 3, § 6.) It may confer upon the district court jurisdiction in any matters of a judicial character, without reference to where such matters may originate; for if the district court does not take jurisdiction of such matters under or by virtue of its appellate jurisdiction, it may take jurisdiction of the same under or by virtue of its original jurisdiction. Any matter judicial in its character can be taken from even a road overseer to the district court, provided the statutes authorize the same; for when the matter gets into the district court the district court can exercise jurisdiction over it as a court of original jurisdiction." (p. 259.)

What court may issue the writ? The district court, to be sure. That is our only court of general jurisdiction. It holds practically all the judicial power of the state. It was no more necessary for the statute to designate the court from which the writ might issue than it is in any other regulatory or penal law or in any other act giving statutory rights of legal redress.

It will thus be seen that whatever may be the demerits of the act, it is free from constitutional infirmities and must

stand as a valid statute. As such it should be respected and enforced, and the state is entitled to judgment.

The writ is allowed.

MARSHALL, J. (dissenting) : I dissent from paragraph 9 of the syllabus and the corresponding portion of the opinion. The duties placed on the secretary of the board of agriculture by the act in question are administrative. A writ of certiorari from any court to the secretary will transfer the proceedings before him to the court granting the writ. When these proceedings reach the court they will then be presented to the court in the same manner in which they were presented to the secretary. If the proceedings were administrative before the secretary, they will continue to be administrative before the court. In certiorari there is continuity of proceedings from the time they are instituted before the subordinate tribunal or official until they are finally determined in court. The court can not determine administrative matters, and for that reason will be without jurisdiction. In 5 R. C. L. 258, the author says:

"The courts are unanimous in holding that the writ of certiorari will lie to review only those acts which are judicial or quasi-judicial in their nature."

If the proceedings are judicial when certified to the court on certiorari, they must have been judicial before the secretary, and the secretary was without authority to entertain them.

Without section 6, the act remains a complete and systematic whole, and can be administered according to its every intent and purpose; and any person injured by any act of the secretary has a right of action in any court of competent jurisdiction. But new proceedings must be commenced. Those before the secretary have ended. Those in the court are separate and apart from those before the secretary. The secretary will act in his administrative capacity. The courts will act in their judicial capacity.

Since the decision in *The State v. Johnson,* 61 Kan. 803, 60 Pac. 1068, this court has adhered to the principle that under our constitution there is as complete a separation of legislative, executive and judicial powers of the government as is possible. In my judgment, section 6 of the act violates that principle.