[Civil No. 3470. Filed January 14, 1935.]

[40 Pac. (2d) 72.]

CITY OF TUCSON, a Municipal Corporation; GEORGE K. SMITH, as Mayor of the City of Tucson; FRED STEGER, HARRY DeFORD, EDWARD T. CUSICK, HENRY A. DALTON, CHARLES H. KROEGER and HENRY O. JAASTAD, Each and All as Members of the Common Council of the City of Tucson; ROBERT E. BUTLER, as City Manager of the City of Tucson; GEORGE A. SLIGHT, as City Electrician of the City of Tucson; and CHARLES C. IRVIN, as City Clerk of the City of Tucson, Appellants, v. ROY R. STEWART, Appellee.

Mr. Thomas J. Elliott, for Appellants.

Mr. George O. Hilzinger, for Appellee.

ROSS, J.—Roy R. Stewart, a practical electrical contractor in the city of Tucson, seeks by this action to have Ordinance No. 693, adopted by the mayor and council of said city on November 7, 1932, declared null and void on the grounds that it is monopolistic, arbitrary, unreasonable, and oppressive, and on the further ground that it was not published as required by the city charter.

The material provisions of the ordinance may be summarized as follows: It authorizes the city manager to appoint a city electrician whose duty it is to inspect and re-inspect all electrical wiring, devices, apparatus or equipment used for the generation, transmission, distribution, and utilization of electrical energy installed, or to be installed, in the city, and upon application in writing to grant permits for such installations. He must order the discontinuance of electrical service when he finds the installation not in conformity with the provisions of the ordinance and "the Electrical Code of the City of Tucson." No installation or alteration, with minor exceptions, can be made without first securing a permit from the city electrician. An applicant for a permit must be the holder of a certificate of registration as an electrical contractor, and accompany his application with plans

and specifications of the proposed installation, so that it may be determined therefrom whether the installation is in accordance with the ordinance and the electrical code of the city. Upon the completion of an installation, if the city electrician finds it fully complies with the provisions of the ordinance and the electrical code of the city, he must issue a certificate of final approval; but if upon inspection he finds it not in compliance with the ordinance and the electrical code of the city and approved methods of construction for safety to life and property, he must refuse his approval. Section 11 of the ordinance provides:

"No certificate of approval shall be issued unless the wiring, devices, apparatus or equipment installations conform with the provisions of this Ordinance, the Electrical Code of the City of Tucson, as adopted by the Mayor and Council by Resolution Number 1309 and as the same may be amended, the statutes of the State of Arizona, and with approved methods of construction for safety to life and property. The regulations contained in the present National Electrical Code, and subsequent editions thereof, and in the present National Electrical Safety Code, and subsequent sections thereof, shall be *prima facie* evidence of such approved methods, provided that the Electrical Code of the City of Tucson shall govern in all cases where there are conflicting provisions."

The ordinance provides for supervising electricians and creates a board of electrical examiners to examine persons applying for licenses as to their qualifications to supervise the installation of electrical equipment. The applicant must be at least twenty-five years of age and have had not less than six years' experience as a journeyman electrician, and must submit to an examination as to his "knowledge of approved methods of electrical installation as contained in this Ordinance and in the Electrical Code of the

City.'' If he passes and pays the board of examiners $5, he is issued a license as a supervising electrician.

Any person, firm or corporation desiring to do any electrical contracting in Tucson must apply in writing to the board of examiners, stating the name of the supervising electrician to be employed, for a certificate of registration as an electrical contractor; pay a fee of $60 (and $30 per year thereafter for renewals); and give a bond in the sum of $1,000 for the benefit of the city and any person, firm or corporation who has suffered damages by reason of the violation of any provision of the ordinance or of the electrical code of the city, or any amendments thereto

Under the provisions of the ordinance, no contractor may do any electrical installation except under the supervision of a supervising electrician. Such supervising electrician, if the contractor is a person, may be himself if licensed, or if not licensed someone employed by him. If the contractor is a firm, the supervising electrician may be a member of the firm or someone employed by the firm who is licensed, and if the contractor is a corporation the supervising electrician may be an officer or employee of the corporation if licensed.

Section 7 gives a schedule of inspection fees to be paid the city by contractors.

Some other facts stipulated in the record are: That plaintiff had some experience as a journeyman electrician and took a course of electrical engineering with the International Correspondence School and has been for twelve years engaged in the business of electrical contracting in the city of Tucson, doing the largest part of his work himself and calling in a helper only when absolutely necessary; that he is a small contractor, his contracts not averaging over $75; that he carries a small stock of materials at his

place of business; and that there are in Tucson fifteen other electrical contractors similarly situated to himself.

In the complaint it is charged that the ordinance is invalid and void for the following reasons: (1) The failure to publish the electrical code; (2) that it is discriminatory and in restraint of trade; (3) that it is monopolistic in that it was adopted and passed at the instigation of certain large electrical contractors for the purpose of preventing plaintiff and others in the same situation from following their business or trade; (4) that the original registration fee of $60 and $30 for yearly renewals thereof is unreasonable, arbitrary and oppressive, as is also the requirement of a $1,000 bond; and (5) that it is unreasonable, arbitrary and oppressive to require the contractor to designate a supervising electrician to supervise his work.

Ordinance No. 693 was published as provided by the city charter, but the Resolution passed on the same day adopting the electrical code of the city was not nor was the electrical code published.

We think we have given enough of the substance of the ordinance and other facts to present the respective contentions of the parties.

The judgment of the trial court was that the ordinance was null and void because the electrical code was not published. The court also found that the ordinance was invalid and void for the reason that it is discriminatory, in restraint of trade, arbitrary, oppressive, unjust and unreasonable.

The city has appealed, contending that the court erred in its findings and judgment.

We will first consider whether it was necessary to publish the electrical code. Unfortunately that instrument is not in the record and we can only sur-

mise its contents from the references made to it in the ordinance. That it was considered by the mayor and council vital is obvious from the repeated requirements in the ordinance that electrical installations should be in conformity with its provisions. Its provisions and those of the ordinance are interdependent. Without the electrical code the kind, size or make of wires, gadgets and other devices to be used and their proper placement in an installation cannot be known by the contractor or his supervising electrician. It and its amendments are to be and remain a continuous, permanent guide to the city and superving electrician and contractor. Section 22 of Ordinance No. 693 makes any person, firm or corporation violating any of its provisions guilty of a misdemeanor. In other words, if a contractor or supervising electrician in installing electrical fixtures should use other fixtures or devices than those designated in the electrical code, or fail to observe the terms of the code in their placement or connections, he would be liable criminally.

Section 8, chapter IX of the Charter of the City of Tucson, provides that ordinances and resolutions having the effect of ordinances must be published at least three consecutive times in the official newspaper of the city and a copy thereof posted in front of the city hall before they become effective and operative. The question then is: When an ordinance constructively consists of two independent parts, but interdependent in their functioning, does a publication of the adopting part meet the requirements of the charter as to publication? Ordinance No. 693 undertakes to adopt the provisions of the electrical code by reference. This method of making laws by the legislative bodies of both the state and municipalities is quite common. The right of the legislature to adopt statutes of the state by reference was sustained by this court

in *Clements* v. *Hall,* 23 Ariz. 2, 201 Pac. 87 (also *State* v. *Roseberry,* 37 Ariz. 78, 289 Pac. 515), and in a later case a law adopting the New York standard form of fire insurance policy was upheld, on the theory that such form of policy was so well and universally known that the court would take judicial notice of it and its provisions. *Scottish Union & Nat. Ins. Co.* v. *Phoenix Title & Trust Co.,* 28 Ariz. 22, 235 Pac. 137.

Other jurisdictions have held that the law-making body of a municipality may enact laws under the reference doctrine in like manner.

" 'An ordinance may by reference adopt the provisions of statutes or prior ordinances, and in such case the statute need not be set out in *totidem verbis,* and entered upon the minutes of the corporation. An ordinance establishing grades of streets may properly refer to maps and books on file in a public office, as a part thereof.' 2 McQuillin, Mun. Corps. (2d Ed.) § 710; *Sloss-Sheffield Steel & Iron Co.* v. *Smith,* 175 Ala. 260, 57 So. 29; *Napa* v. *Easterby,* 76 Cal. 222, 18 Pac. 253; *Southern Operating Co.* v. *Chattanooga,* 128 Tenn. 196, 159 S. W. 1091, Ann. Cas. 1914D, 720." *City of Milwaukee* v. *Krupnik,* 201 Wis. 1, 229 N. W. 43. See, also, *City of Litchfield* v. *Thorworth,* 337 Ill. 469, 169 N. E. 265; *Greene* v. *Town of Lakeport,* 74 Cal. App. 1, 239 Pac. 702.

The reference may be to a statute of a state, a preexisting ordinance of the municipality adopting it, or to a public record already established by law. The electrical code adopted by the city of Tucson is neither a statute nor an ordinance. It is, if anything, a public record of the city. The mayor and common council, under subdivision 33, chapter VII of the Charter, are vested with power "to pass ordinances and resolutions and to adopt orders upon any subject of municipal control. . . . "

The "wiring of buildings or other structures for the use of electricity for lighting, power, or other purposes" is made by subdivision 12 of said chapter a subject of municipal control.

 The electrical code was adopted by a resolution or order of the mayor and council and is therefore a document or paper entitled to be among the files of the city. The city clerk is made the custodian of "all books, papers, records and archives belonging to the city." Section 10, chap. X. We think we should presume, in the absence of contrary showing, that the electrical code is on file with the clerk and open to inspection by any person interested. In other words, it is a public record lawfully established.

 It is well settled that the publication of an ordinance under the reference doctrine is sufficient and that it is not necessary to publish the statute, ordinance or public record referred to therein. This rule is based on the idea that that is certain which may be made certain. *City of Napa* v. *Easterby,* 76 Cal. 222, 18 Pac. 253; *Croker* v. *Board of Excise Commrs. of City of Camden,* 73 N. J. L. 460, 63 Atl. 901; *Southern Operating Co.* v. *City of Chattanooga,* 128 Tenn. 196, 159 S. W. 1091, Ann. Cas. 1914D 720; *Baumgartner* v. *Hasty,* 100 Ind. 575, 50 Am. Rep. 830; *City and County of Denver* v. *Bargen Land & Inv. Co.,* 83 Colo. 551, 267 Pac. 405.

Plaintiff cites us to *L. A. Thompson Scenic Ry. Co.* v. *McCabe,* 211 Mich. 133, 178 N. W. 662, 664, wherein the court held that a building code adopted and incorporated by reference into an ordinance of the city of Detroit should have been published, and insists that this is decisive of the present case. There it appears that the building code when filed with the city clerk had not been enacted into legislation or ordained by the common council, nor had it received the approval

of the mayor or become operative. The court said: "It, therefore, was entirely lacking in those characteristics necessary to entitle it to be filed as a 'public record.'" In other words, the court held that the building code was, "in a legal sense, a fugitive paper 'in the custody of the city clerk.'" The electrical code of the city of Tucson, unlike the building code of the city of Detroit, was approved by the mayor and the council of the city of Tucson and lodged with the proper custodian.

■ The right to enact Ordinance No. 693 is referable to the city's police power, and such power is dependent upon the provisions of the city's charter or enabling legislation. Subdivision 18 of section 1 of chapter IV of the City's Charter vests in the city power "to license and regulate . . . the carrying on of any and all professions, trades, callings, occupations and kinds of business carried on within the limits of said city, and to fix the amount of license tax thereon. . . ." And subdivision 12 of section 1 of chapter VII confers the power on the mayor and council "to regulate . . . the manner and materials used in wiring buildings or other structures for the use of electricity for lighting, power or other purposes. . . ." Thus the power to license and regulate the business of electrical wiring and installation and also the persons carrying on such business is specifically conferred on the city by its organic law. It is obvious that the nature of electricity is such that the exertion of the police power thus conferred on the city is justified as a method of affording the citizens of the city security, comfort and safety in the use and occupancy of their property. This proposition is so well settled that it needs no elaboration or citation of authority. The power of the city to enact ordinances to protect property and secure the comfort,

safety and welfare of its inhabitants is as well recognized as is its right to enact ordinances to protect the public health.

■■ The question, then, is not one of the power of the city to license and regulate the electric wiring business and those engaged in such business, but whether the regulatory provisions are in conformity with well-recognized rules and principles of law. If such regulations definitely and certainly define the duties and obligations of the persons therein authorized to install electrical wiring, and are reasonable and not monopolistic or oppressive, they are a proper exercise of the city's police power. As the uses of electricity have increased, safety devices to protect life and property against its destructive tendencies have been discovered and utilized. Unless these safety devices are employed, the danger of electrocution or a destructive fire is always present. Hence the necessity of requiring installations to be made according to the latest approved methods and under the supervision of persons who by education, training and experience possess a knowledge of electricity and its aptitude when not properly confined to cause damage. The provisions of the ordinance requiring those persons desiring to supervise electrical installation to submit to an examination as to their qualifications, and if found qualified to pay $5 for a license, and the requirements that all contractors have a licensed supervising electrician to supervise their contracts, and requiring contractors before doing business to obtain a certificate of registration, seem to us entirely reasonable and well within the power of the mayor and council to promulgate. These requirements have for their purpose the definite object of protecting the lives and property of the citizens. It is said:

"A municipal ordinance of a regulatory nature in contravention of the natural rights of individuals enacted under general charter powers is not only required to be constitutional but it must be reasonable as well; that is, the court before which it is brought must be able to see that it will tend to promote the public health, morals, safety or welfare; that the means adopted are adapted to that end, and that it is impartial in operation and not unduly oppressive upon individuals." 19 R. C. L. 805, § 112.

In view of the laws thus enunciated: What may be said of the provisions of the ordinance limiting the right to apply for a supervising electrician's license to persons not less than twenty-five years of age, with not less than six years' experience as a journeyman electrician, or four years' experience providing the applicant is a graduate from or has attended upon a recognized electrical school or college? The learned professions of the law and medicine place no such age limit upon those applying for admission to them, but open their doors to all who have reached majority. We doubt if greater maturity is more essential to the occupation of an electrician than in the professions that have to do with the health, life and property of the individual. Most of the professions and businesses welcome into their ranks those members of society who have arrived at legal age, if they possess the necessary qualifications.

Again, why are applicants limited to journeymen with six years' experience or the equivalent thereof? Six years' experience as a master electrician conceivably would do as much to qualify the applicant as six years' experience as a journeyman electrician. Self-education by experience, especially if a person is mechanically and scientifically minded, is often equal or better than that under tutorage.

The plaintiff and fifteen others in the city of Tucson according to the stipulated facts, had been operating as practical electricians or contractors in that city for twelve or more years, and yet they are denied a license that would permit them to carry on their business, whereas someone who may have been in their employ for six years as a journeyman electrician may obtain a license. *State* v. *Justus*, 90 Minn. 474, 97 N. W. 124; *Commonwealth* v. *Shafer*, 32 Pa. Super. 497. Not only this, but plaintiff and those others in his situation must employ a licensed supervising electrician to superintend every electrical contract they may secure. It is not shown what the yearly income of these small contractors is, or what wage the licensed supervising electrician receives, but it is most probable the small contractor would have nothing left for his labor and trouble after paying a supervising electrician.

■ For the above and foregoing reasons, we think the restriction as to age and also the limitation of the right to a license of supervising electrician to journeymen are oppressive, arbitrary and monopolistic, and not in the interests of safety to property or life.

■■ Plaintiff contends that the amount of the registration fee exacted of electrical contractors is in excess of the cost of inspecting and regulating the installation of electrical apparatus and equipment and of the issuance of registration certificates and is therefore oppressive and unreasonable. The rule is that: "If the fee or tax is imposed in the exercise of the police power for purposes of regulation, as a general principle the amount which may be exacted may include, and must be limited and reasonably measured by, the necessary or probable expenses of issuing the license, and of such inspection,

regulation and supervision as may be lawful and necessary. If it is manifest that the amount imposed is substantially in excess of, and out of proportion to, the expenses involved, it generally will be regarded as a revenue measure, and be held unreasonable and void as a regulation under the police power. . . . '' 37 C. J. 190, § 41. Unquestionably Ordinance No. 693 is a police measure, having for its object the supervision and regulation of electrical installations. That being so, the registration fees should, to be lawful, be imposed for the purpose of defraying the expenses incidental to such supervision and regulation and should be approximately commensurate with such expenses. The ordinance places the original fee at $60 per calendar year or any fraction thereof, and for renewals $30 per calendar year or any fraction thereof. The fee is the same for one month or one day as for a year, although the work of inspection or regulation may be only $1/12$ or $1/365$ as much as for a calendar year. This is very significant and tends to show that the registration fee is not one in aid of regulation or for supervision or inspection but for some other purpose.

Section 7 of the ordinance lists a schedule of fees that must be paid to the city by a contractor before he is given a permit to contract for electrical wiring, including 50 cents for the permit. These fees are for inspecting outlets, lighting fixtures, rectifiers, motors or generators, electrical heating or cooking appliances, and wiring for signs, and range in amount from 5 cents to $3 for each inspection. Then follows a general provision: ''For the inspection of any electrical equipment for which no fee is prescribed herein, there shall be paid a fee of Two Dollars ($2.00) per hour for the time actually consumed in making such inspection, provided that the minimum inspection

charge shall not be less than One Dollar ($1.00).'' Then is provided a fee of $2 per hour for re-inspection by the city electrician, and if in his opinion the re-inspection was made necessary through negligence or intentional disregard of the provisions of the ordinance, he may exact the $2 per hour, but in no case is the fee for re-inspection to be less than $1.

*Supervision* of installation under the provisions of the ordinance is committed to the contractor's licensed supervising electrician. All *inspection* is by the city electrician and the fees therefor are paid by the contractor. The board of examiners receives no compensation. So, the question naturally is: Why the $60 fee for registering a contractor and $30 for renewals thereof? In *Detroit Retail Druggists' Assn.* v. *City of Detroit,* 267 Mich. 405, 255 N. W. 217, 218, it is said:

''The principles governing licensing occupations are well settled. They were succinctly stated by Mr. Justice POTTER in *Fletcher Oil Company* v. *Bay City,* 247 Mich. 572, 226 N. W. 248, 250: 'The imposition of license fees as a condition to issuing a license when plainly intended as police regulations will be upheld if the revenue derived therefrom is not disproportionate to the cost of issuing the license and the regulation of the business licensed. Anything in excess of an amount which will defray such necessary expenses cannot be imposed under the police power alone, because it then becomes a revenue measure. What is a reasonable license fee must depend upon the sound discretion of the legislative body imposing it having reference to the circumstances and necessities of the case. It will be presumed the amount of the fee is reasonable unless it contrarily appears upon the face of the ordinance, by-law or law itself, or is established by proper evidence. In determining whether a fee required for a license is excessive or not, the expense or amount of regulatory provisions and the nature of the subject of regulation should be

considered, and, if the amount is wholly out of proportion to the expense involved, it will be declared a tax. If revenue is incidentally derived which is not so disproportionate as to make the fee charged unreasonable there can be no objection.' ''

The ordinance places no duty to *supervise* installation of electrical apparatus and equipment upon the officers of the city except when such apparatus and equipment are owned, used or operated by the city, in which case the duty of supervision devolves upon the city electrician (section 3). All other supervision is committed to the supervising electricians employed and paid by contractors. We think it ''appears upon the face of the ordinance'' that the registration fee and fee for renewals thereof are not imposed for supervision or regulation, and certainly not for inspection since the inspection fees are paid by the contractors. It appears that the imposition of·the registration fees is for revenue and not in aid of the enforcement of the regulation or supervision of the electrical wiring installations. In such a situation, it is as much the duty of the court to declare the tax void as if it were established by evidence. 37 C. J. 194, § 45.

May the city require a bond of an applicant, conditioned to protect the city and others who may suffer damages by reason of the violation by him of any of the provisions of the ordinance and electrical code or any amendments thereof, before issuing to such applicant a certificate of registration? It is the contention of plaintiff that this exaction is not within the police power of the city and is an unwarranted interference in the right to contract. He cites as supporting his contention *Harrigan & Reid Co.* v. *Burton,* 224 Mich. 564, 195 N. W. 60, 62, 33 A. L. R. 142, which, indeed, does hold that a municipality in

requiring a bond from a heating contractor to protect the property owner "who chooses to make a legitimate contract with him for the purchase of a heating system or warming apparatus and installing it in his private dwelling suggests a measure of paternalism in the ordinary business relations of private parties beyond the normal scope of the police power of a municipality."

In *State* v. *City of Sheridan,* 25 Wyo. 347, 170 Pac. 1, 1 A. L. R. 955, it was held that the police power of a city does not extend to requiring one contracting to lay concrete pavements to give bond for the faithful performance of the work, and to protect customers against defects for a term of five years, on the ground that the regulation was unreasonable and operated oppressively against persons unable to give bond because of their slender means. A like conclusion was come to in *Gray* v. *Omaha,* 80 Neb. 526, 114 N. W. 600, 14 L. R. A. (N. S.) 1033. In *State* v. *District Court,* (N. D.) 253 N. W. 744, 748, an ordinance of the city of Bismarck required plumbers to give a bond in the sum of $1,000, conditioned to save harmless the city. That court made this statement: "A city should leave it to the individuals employing plumbers or having plumbing done to protect their personal interests by contract as they themselves may see fit. *Harrigan & Reid Co.* v. *Burton,* 224 Mich. 564, 195 N. W. 60, 33 A. L. R. 142. But a city regulating the plumbing business and licensing plumbers to carry it on may well protect itself by requiring, as this ordinance does, the giving of a bond conditioned as therein required," thereby approving by *dictum* the doctrine in the Harrigan case.

The rule announced in the Harrigan case has not been accepted by the courts of other jurisdictions as a correct statement of the law. It was criticized

and disapproved in *State ex rel. Brewster* v. *Mohler,* 98 Kan. 465, 158 Pac. 408, 409 (and was affirmed by the Supreme Court of the United States in *Payne* v. *State of Kansas ex rel. Brewster,* 248 U. S. 112, 39 Sup. Ct. 32, 63 L. Ed. 153), also in *City of New-* nan v. *Atlanta Laundries,* 174 Ga. 99, 162 S. E. 497, 87 A. L. R. 507. In the Brewster case the court was construing a state law requiring a bond of commission merchants engaged in the business of handling agricultural products, and it was there said:

"It is sometimes contended that the state cannot regulate private business, and that unless the business is one of public concern it is exempt from legislative interference. Probably this notion is due to the fact that the modern American state has hitherto left private business largely to its own devices, and because the state in recent years has largely concerned itself with the regulation of business as to which the public's interest was undeniable. Hence the elaborate statutes regulating public service corporations. But there can be no doubt that the state's police power may extend to private business. Our statutes relating to registration of deeds and mortgages, the statute of frauds, the mechanic's lien law, and the like are illustrations of the exercise of the state's police power over private business. It is also true that business which has heretofore been considered to be private may by changes and progress in the methods of its conduct be transformed into a public or *quasi* public business, and this may make it desirable and even imperative that the state concern itself in its regulation and control. Of course such regulations must be reasonable, but if they are reasonable they must be obeyed."

Other cases announcing the same rule are: *Hawthorn* v. *People,* 109 Ill. 302, 50 Am. Rep. 610; *State ex rel. Beek* v. *Wagener,* 77 Minn. 483, 80 N. W. 633, 778, 1134, 77 Am. St. Rep. 681, 46 L. R. A. 442; *City of Portland* v. *Western Union Tel. Co.,* 75 Or. 37,

146 Pac. 148, L. R. A. 1915D 260; *Ferguson-Hendrix Co.* v. *Fidelity & Deposit Co.*, 79 Wash. 528, 140 Pac. 700; *State* v. *Walter Bowen & Co.*, 86 Wash. 23, 149 Pac. 330, Ann. Cas. 1917B 625; *People* v. *Beakes Dairy Co.*, 222 N. Y. 416, 119 N. E. 115, 3 A. L. R. 1260.

In the case of *City of Newnan* v. *Atlanta Laundries, supra,* the validity of an ordinance requiring a laundryman to execute a bond to protect his customers against loss was sustained as a proper exercise of the police power.

In *Ex parte Davis,* 118 Or. 693, 247 Pac. 809, 811, a city ordinance requiring a bond from a master plumber, to protect those for whom he did plumbing against loss, was upheld, the court saying:

"We may well say also that it is within the scope of the police power to require that those engaged in the business, as contractors or otherwise should give security to those affected by their operations to save them harmless from damages arising out of the delinquencies of the former."

In *City of Shreveport* v. *Bayse,* 166 La. 689, 117 So. 775, the provision of an ordinance requiring master electricians to execute a bond was sustained as a proper exercise of the city's police power.

Ordinance No. 693 as a fire prevention measure is one in which all the people of Tucson are vitally and directly interested. A defective installation or connection of a wire electrically charged potentially is a threat of danger to a much larger area than the structure or building containing the installation. Defective wiring is also a menace to life. It may be that a bonded responsibility for damages occasioned by defective installations would cause the contractor to exercise a greater care and skill in making electrical installations, and if so it

would to that extent lend protection to the public and be a proper police regulation. The amount of the bond, and whether one should be exacted, is primarily a question for the mayor and council. Likewise the reasonableness of the regulation is one for the law-making body. *State* v. *City of Laramie,* 40 Wyo. 74, 275 Pac. 106. The bond should not be so large or onerous as to prevent persons otherwise qualified to install electrical wiring from engaging in their business. *State* v. *City of Sheridan, supra; Gray* v. *Omaha, supra.* In view of the expert supervision of construction contracts and the expert inspection thereof by the city electrician, and the right of the property owner to protect himself by contract, indemnity bonds prohibitive in their nature should not be required. Regulatory measures that affect the right of people to work and earn a livelihood should always be so drawn as not to unnecessarily hamper or destroy such right. As was said in *Coffeyville Vitrified Brick & Tile Co.* v. *Perry,* 69 Kan. 297, 76 Pac. 848, 849, 1 Ann. Cas. 936, 66 L. R. A. 185:

"The right to follow any lawful vocation, and to make contracts, is as completely within the protection of the Constitution as the right to hold property free from unwarranted seizure, or the liberty to go when and where one will. One of the ways of obtaining property is by contract. The right, therefore, to contract cannot be infringed by the Legislature without violating the letter and spirit of the Constitution. Every citizen is protected in his right to work where and for whom he will."

There are a number of cases holding that an ordinance, requiring a plumber doing business alone to secure a license to operate on his own account while permitting firms or corporations to do business and employ helpers if only one member of the firm or one executive officer of the corporation secures a license,

is invalid for discrimination against the plumber doing business alone, and violative of the Fourteenth Amendment to the federal Constitution. In one of the leading cases so deciding (*State* v. *Benzenberg,* 101 Wis. 172, 76 N. W. 345, 346), Mr. Justice WINSLOW reasoned thus:

"Under the law before us, it seems entirely clear that there is discrimination in favor of firms and corporations as against a plumber doing business alone. The plain meaning and effect of the law is that several plumbers may form a partnership or corporation, and all engage in practical plumbing, when only one of their number has obtained, or perhaps is able to obtain, a certificate of competency. Thus three or four incompetent plumbers may associate themselves with another who has a certificate, and become thus enabled to do business, while a man perfectly competent, but doing business alone, must go through an examination and obtain a certificate. This is certainly discrimination between persons under the same circumstances and conditions. It grants special privileges to members of a firm or corporation, and imposes special restrictions upon persons engaged in the same business, who wish to prosecute their business alone."

*City of Vicksburg* v. *Mullane,* 106 Miss. 199, 63 So. 412, 50 L. R. A. (N. S.) 421, is another well-reasoned case holding an ordinance of the city of Vicksburg, permitting a firm or corporation to carry on the business of plumbing upon a license to a member of such firm or an officer of such corporation but requiring an individual engaged in the same business to be licensed, invalid and discriminatory because the ordinance permitted members of the partnership and officers and employees of the corporation to work at the trade without being examined as to their qualifications and without obtaining a license. For other cases, see *City of Vicksburg* v. *Mullane, supra,* and note thereto at 50 L. R. A. (N. S.) 421.

It is evident that Ordinance No. 693 was drawn with a knowledge of these decisions and with a studied effort to avoid the legislative mistake condemned by them. The question is: Does it avoid such mistake? Under the ordinance every holder of a certificate of registration is authorized to contract electrical wiring and installation, but whether it be a person, firm or corporation, the wiring and installation must be under the supervision of a supervising electrician, designated as such in each application for a permit to do construction, and such supervising electrician must be either the holder of a certificate of registration or in the employment of a holder. It is thus seen that no person may be a supervising electrician unless licensed, and to that extent all registered contractors are in the same category, whether such contractors be persons, firms, or corporations. But does this fact dispense with the discrimination intended to be avoided? Where the contractor is an individual doing all his work, or practically all of it, it of necessity requires him to be a licensed electrician; but if the contractor is a firm or corporation, it may operate on a license to a member or employee of the firm, or an officer or employee of the corporation. In other words, in the case of a firm or corporation, if the work is supervised by a member of the firm or by an officer of the corporation, only such supervisor must be licensed. There is no restriction on unlicensed partners or unlicensed officers or employees, however numerous, doing work in the performance of the contract. Or, if none of the partners is qualified to obtain a license, the firm may employ a licensed electrician to supervise the work, while the unlicensed partners may do the actual construction under his supervision. All the officers and employees of a corporation, when the latter employs a licensed electrician to supervise the work,

may likewise do the actual construction. In the case of the individual contractor, there are no partners or officers, as in partnerships or corporations, to become qualified electricians by his securing a supervising electrician's license. His working force is not enlarged thereby.

Ordinances with provisions as to licensing persons, firms and corporations practically the same as 693 have been declared invalid because discriminatory (*Henry* v. *Campbell*, 133 Ga. 882, 67 S. E. 390, 18 Ann. Cas. 178, 27 L. R. A. (N. S.) 283; *City of Vicksburg* v. *Mullane, supra*) and, we conclude, correctly so.

Regulatory ordinances must be definite and certain. The reason therefor is stated in 19 Ruling Case Law, 819, § 114, as follows:

"An ordinance of a regulatory nature must be clear, certain and definite, so that the average man may with due care after reading the same understand whether he will incur a penalty for his actions or not. Otherwise it is void for uncertainty."

A violation of any of the provisions of Ordinance No. 693 is made a misdemeanor. The electrical code is a part and parcel of the ordinance. Considering these two together, they must lay down rules of action or regulations of fixed and definite standards for the guidance of property owners, contractors and supervising electricians for installation of electrical apparatus. The only rule in that regard to be found in the ordinance is that installation shall conform with its provisions, the electrical code, the statutes of the state (of which there is no pertinent statute), and with the "approved methods" of construction for safety to life and property. If the rules to be followed in an installation were left to those set out in the ordinance and electrical code, it might be they would be definite and certain and suffi-

cient to inform one acting thereunder as to what he should do to avoid a penalty for their violation. But the rule goes further and requires him to conform with the "approved methods" of construction for safety to life and property. It also requires him to take notice of amendments to the electrical code and conform with them in the construction. It is well known that science is daily discovering not only new uses for electricity but also new and safer methods of protection in its use. The contractor or supervising electrician might have one opinion as to the *approved methods,* and the city electrician, who is given final say as to whether the construction conforms with the approved methods, another and entirely different opinion. The fact that the ordinance provides that in determining the approved methods the regulations of the present National Electrical Code and the present National Electrical Safety Code and subsequent editions thereof may be taken as *prima facie* evidence of such methods, but that in case of conflict the electrical code of the city of Tucson shall govern, does not lend clarity, certainty, or definiteness to the regulations, but rather suggests conflicts for an administrative officer of the city to reconcile.

The electrical code was adopted by reference "as is," and not as it may be changed or altered. Likewise the rules of evidence to be applied in determining whether construction is in conformity with the ordinance and electrical code, if such a rule may be adopted, is the one subsisting at the time of its adoption and not one later promulgated by the national societies mentioned. In *State* v. *Crawford et al.,* 104 Kan. 141, 177 Pac. 360, 2 A. L. R. 880, the question was as to the validity of a state law providing that "all electric wiring shall be in accordance with the National Electrical Code." Gen. Stats. 1915, § 4863. This law was held unconstitutional as an

attempted delegation of legislative authority to private individuals and associations, and void for uncertainty. The comments of the court on this legislation are quite interesting and enlightening and may be read with profit by those interested. The electrical code of the city of Tucson is not subject to all the objections taken to the National Code in the above case, for it was adopted by the law-making body of the city of Tucson. But the ordinance, in requiring conformity in construction to be in accordance with the amendments of the code, or the regulations of some private association, certainly is delegating its powers to make the city's laws. The ordinance cannot be amended by changing the regulations of the electrical code, nor can the electrical code be amended except by ordinance in direct terms or by reference.

The judgment holding the ordinance invalid because the electrical code was not published and posted is in error and to that extent is reversed. We concur, however, in the court's legal conclusions to the effect that the ordinance is discriminatory, arbitrary, oppressive and unreasonable and therefore void, and remand the case, with directions that judgment be entered in accordance with said conclusions, with costs to plaintiff.

Section 24 of the ordinance has the common provision that the invalidity or unconstitutionality of any section, paragraph, sentence, clause or phrase shall not affect the validity or operation of the remainder thereof. The ordinance cannot be enforced, either in whole or in part, unless the provision concerning the licensing of supervising electricians is valid. We have found that provision in the respects pointed out to be arbitrary and unreasonable. Therefore the whole ordinance must fail.

LOCKWOOD, C. J., and McALISTER, J., concur.