204 P.2d 854

**HERNANDEZ v. FROHMILLER et al.**
No. 5202.

Supreme Court of Arizona.
April 4, 1949.

Whitney, Ironside & Whitney, of Phoenix, for petitioner.

Charles L. Strouss, of Phoenix, for respondent.

Perry M. Ling, Asst. Atty. Gen., for intervenors.

William P. Mahoney, Jr., of Phoenix, for American Federation of Labor, amicus curiae.

Jack Choisser, of Phoenix, and Thomas J. Elliott, of Tucson, for Cities and Towns of Arizona, amicus curiae.

John W. Corbin, of Phoenix, for City of Glendale, amicus curiae.

James A. Walsh, of Phoenix, for Police and Fire Departments of City of Phoenix, and Deputies in Office of Sheriff of Maricopa County, amicus curiae.

Warren McCarthy, Deputy County Atty. of Maricopa County, of Phoenix, for Board of Supervisors, amicus curiae.

Floyd E. Thomas, of Tucson, for Board of Regents of University and State Colleges of Arizona, amicus curiae.

WINDES, Judge.

An alternative writ of mandamus was issued out of this court commanding Ana Frohmiller as auditor of the state of Arizona to audit and allow the claim of petitioner and to draw a warrant in her favor on the treasurer of the state of Arizona for wages due petitioner for personal services rendered to the state, or show cause why she had not done so. The auditor has declined and refused to allow the claim on the ground that to do so would be in violation of section 6 of that certain initiative measure enacted at the general election of November 2, 1948, and hereinafter referred to as the civil service act. Petitioner alleges that the initiated measure is unconstitutional and void, and it is, therefore, the auditor's duty to audit and allow the claim.

In response to the writ, respondent admits that she, but for the provisions of the civil service act, is legally obligated to issue the warrant. Respondent takes the position that as a state officer she should assume that the civil service act is constitutional, and that it is her duty to comply with the provisions thereof unless and until it has been adjudged unconstitutional by this court.

Petitioner contends that the civil service act is unconstitutional in that it (1) delegates legislative power to a civil service board in the executive branch of the state government; (2) is vague, ambiguous, confusing, uncertain, and incomplete, and does not establish fixed standards or guides for its administration; and (3) is violative of the essentials of due process of law, and offends article 4, part 2, section 13 of the Arizona constitution requiring that subjects embraced in an act shall be expressed in the title. The civil service board provided for under the act and which was appointed by the governor was allowed to intervene, and filed a motion to dismiss the petition upon the ground it fails to state a claim for which relief could be granted.

Briefs amici curiae were filed on behalf of Maricopa county, the cities of Phoenix, Tucson, Glendale, Mesa, the town of Tolleson, the Board of Regents of the University and State Colleges of Arizona, the American Federation of Labor, and the Phoenix Police and Fire Departments, and Sheriff's Deputies.

Due to the fact that the entire payroll of the state for its officers and employees had been tied up by the auditor, the court immediately began its examination of the legal questions presented with the view of making a prompt determination of the matter. Being of the unanimous opinion that the initiative measure is unconstitutional and void in its entirety, an order was entered on January 31, 1949, that the alternative writ be made permanent, with the statement that due to the exigencies of the situation involving a tie-up of the state payroll it was advisable to announce the

court's decision, and that the written opinion would be prepared later.

Subsequent to the election, the votes were duly canvassed, disclosing that the measure had carried, whereupon the governor issued his proclamation declaring the measure approved and adopted by the electors in the form and manner following:

"An Act

To establish a civil service board with powers to classify all positions in the state civil service according to their respective duties and responsibilities, to establish rates of compensation for all classes of positions, to determine by competitive performance the qualifications of all candidates for positions in the state civil service, to make rules and regulations covering all personnel transactions, to regulate all conditions of employment in the state civil service; providing for the administration of the boards powers by a state personnel officer, providing for an annual appropriation by the legislature to enable the board to execute such powers; requiring the county boards of supervisors in class I counties and authorizing the county boards of supervisors in all other counties to establish civil service systems covering certain appointive officers and employees.

Be it enacted by the people of the state of Arizona:

Section 1. Purpose of Act. It is the purpose of this Act:

(a) To promote and increase economy and efficiency in the State Service.

(b) To provide a comprehensive personnel system for the State Civil Service, wherein:

First: Positions involving comparable duties and responsibilities are similarly classified and compensated.

Second: Appointments are based upon merit and fitness ascertained through practical and competitive examination.

Third: State civil service employment is made a career by providing for security of tenure and the advancement of employees within the service wherever practicable.

Fourth: The rights and interests of the State civil service employee given consideration in so far as consistent with the best interests of the State.

Fifth: A high morale is developed among State Civil Service employees by providing adequately for leaves of absence, vacations, and other considerations for the general welfare of said employees.

Sixth: Tenure of civil service employment is subject to good behavior, efficiency, the necessity for performance of the work, and the appropriation of sufficient funds.

The State Civil service is hereby declared to consist of all positions in the State service including positions with any Board, office, or commission of the State, or any political subdivision thereof, except those filled by popular election, public officers,

members of board and commissions, employees of courts of record, of the legislature, members of teaching staffs of all educational institutions maintained or supported by the State, all persons in the military and naval forces of the State, and not to exceed one other exempt position in each department, board or commission, or two other exempt positions for each elected administrative officer.

Section 2. There is hereby created a civil service board to consist of three persons appointed by the governor subject to confirmation by the Senate for six-year overlapping terms, the three original appointments to be for two, four and six years respectively. This board shall supersede any existing State personnel agencies and succeed to their appropriations, records, supplies, equipment and other property. Each member of the board shall be paid twenty-five dollars per day and necessary expenses actually incurred for each day devoted to duties as a member of the board.

Section 3. The board shall classify all positions in the State civil service according to their respective duties and responsibilities, establish rates of compensation for all classes of positions, approve or disapprove disbursements for all personnel services, determine by competitive performance exclusively on the basis of merit, efficiency and fitness, the qualifications of all candidates for positions in the State civil service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the State civil service. No person shall be appointed to or promoted in the State civil service who has not been certified as qualified for such appointment or promotion by the board.

All persons in the State holding positions in the classified services as established by this Act at the time it takes effect shall retain their position until discharged, reduced, promoted or transferred in accordance with provisions of this Act, and rules and regulations of the Civil Service Board governing same.

No removals from or demotions in the State Civil Service shall be made except for just cause which shall be determined by the Board.

Section 4. The Board shall employ a State personnel officer who shall be in the classified civil service and who shall be selected after open competitive examination. The personnel officer shall employ, subject to the provisions of this amendment, the necessary staff.

Section 5. To enable the board and the personnel officer to execute these powers, the legislature shall appropriate for each and every fiscal year a sum not less than one per cent of the aggregate annual pay roll of the State service for the preceding fiscal year as certified to by the board.

Section 6. On and after the first day of January following approval hereof no pay-

ment for personal service shall be made or authorized until the provisions of this amendment have been complied with in every particular. Violation of any of the provisions hereof may be restrained or observance compelled by injunctive or mandamus proceedings brought by any citizen of the State.

Section 7. The boards of supervisors in Class I counties shall prior to the effective date of this amendment establish civil service systems and the boards of supervisors in all other counties may establish civil service systems covering certain appointive officers and employees.

Section 8. This amendment shall take effect on the first day of January following its approval."

■ The constitutionality of this initiative act must be tested by the same rules that are employed in testing the validity of laws enacted by the legislature. Article 22, section 14, Constitution of Arizona; Tillotson v. Frohmiller, 34 Ariz. 394, 271 P. 867.

■ A heavy responsibility rests upon the court when it is called upon to declare legislation unconstitutional. It must recognize and give full weight to the lawmaking power of the legislative branch of the government. It is therefore the well-established rule that no court should strike down legislation if there can be found a legal basis for its validity. We have given full weight to this rule.

Following the purpose clause, under section 1, it is stated: "The State civil service is hereby declared to consist of all positions in the State service including positions with any Board, office, or commission of the State, *or any political subdivision thereof, * * *.*" (Emphasis supplied.)

Political subdivisions of the state include not only counties, cities, towns, and school districts, but under section 7, article 13, Arizona Constitution, as amended, include irrigation, power, electrical, agricultural improvement, drainage, and flood control districts. There is nothing ambiguous in the foregoing provision, and if given full effect every political subdivision of the state would come under the supervision of the state board appointed by the governor. The title of the act makes no reference to political subdivisions of the state except the counties. Article 4, part 2, section 13, of the Arizona constitution, reads as follows: "(Title.)—Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

As applicable here, the purpose of this provision of the constitution is to enable the voter upon reading the title to be advised as to what to expect in the body of the act. It is to prevent the voter (the

legislator) from being surprised and enacting something he never intended. Hancock v. State, 31 Ariz. 389, 254 P. 225. Certainly one reading the title could expect that the only political subdivisions included were those mentioned therein. Surely one reading this title would expect it to be applicable only to state and county employees. Recognizing the utter impossibility of applying the act to all political subdivisions it has been urged that we judicially modify the language so as to limit the meaning thereof, and thereby make it applicable only to state employees attached to political subdivisions, or that we say that "political subdivisions" is meant to include such entities as bodies politic or corporate, such as the Arizona Power Authority. We recognize the rule that, when giving the literal meaning to language of a statute results in an absurdity or impossibility, courts will under some circumstances alter, modify, or supply words in order to give effect to the plain intention of the lawmaker. This does not mean that when language has a plain meaning to which effect cannot legally be given, the court will try to guess what the lawmakers intended. For the court to say that the words "the state, or any political subdivision thereof" mean something other than what they say, the court would in this instance have to start with a guessing game and end in a fog.

Counsel have stressed the fact that this law was copied substantially from the Michigan law, and urge that if good in Michigan it should be good here. This provision was not in the Michigan law but was inserted by the framers of this act. Why it was added is very difficult to determine. If possible we should ascribe to it some useful purpose. We think it was not intended to be all-inclusive for the reason that nowhere else is there any provision made for establishing civil service systems in any political subdivisions except the counties. Consequently the only political subdivisions enumerated to which it could refer are the counties. Of course if this were the meaning it would have been easy to say "any political office, board, or commission of the state or any county thereof." Not having so made it clear, would it not be more reasonable to say the phrase meant any board, office, or commission of the state or any political subdivision thereof coming under the provisions of this act? We think this is the only possible function the phrase could serve, if any.

The foregoing section 1 also declares that the state civil service shall consist of all positions in the state service "except * * * members of teaching staffs of all educational institutions maintained or supported by the State, * * *." The plain meaning of this is that all employees of educational institutions maintained or supported by the state, except members of teaching staffs, fall within the classified civil service under the supervision of the

civil service board and its personnel officer. The board of regents of the university and state colleges, as amicus curiae, calls our attention to article 11, section 2, Arizona constitution, which reads: "(Supervision of school system.)—The general conduct and supervision of the public school system shall be vested in a state board of education, a state superintendent of public instruction, county school superintendents, and such governing boards for the state institutions as may be provided by law."

Clearly this means that our schools, including the educational institutions supported by the state, such as the university and state colleges, are to be under the supervision of special governing boards. Our governing board for the university and state colleges is the board of regents. To permit legislation to throw the employment and supervision of all personnel under the civil service law, except the teaching staff, would necessarily deprive the board of regents of a large portion of its constitutional supervisory power. We have no hesitation in holding that such legislation runs counter to said article 11, section 2, Arizona constitution.

The contention is made that the law is so indefinite, uncertain and incomplete that it is incable of being intelligently executed, and is, therefore, unconstitutional. There are numerous adjudications in the various state and federal jurisdictions upon this question, many sustaining and many rejecting legislation. This court has felt impelled to reject legislation upon this ground. City of Tucson v. Stewart, 45 Ariz. 36, 40 P.2d 72, 96 A.L.R. 1492; Board of Control of State of Arizona v. Buckstegge, 18 Ariz. 277, 158 P. 837; State v. Walgreen Drug Co., 57 Ariz. 308, 113 P.2d 650.

While a statute must be definite to be valid, and reasonable precision is required, yet merely because it is difficult to interpret does not condemn it as offending the constitution. That we may not go astray and enter a field of loose language, we need a yardstick whereby this law may be fairly measured in this respect. In the case of Vallat v. Radium Dial Co., 360 Ill. 407, 196 N.E. 485, 487, 99 A.L.R. 607, the court stated: "In order that a statute may be held valid, the duty imposed by it must be prescribed in terms definite enough to serve as a guide to those who have the duty imposed upon them. Such definiteness may be produced by words which have a technical or other special meaning well enough known to permit compliance therewith or words which have an established meaning at common law through decisions; but if the duty is imposed by statute through the use of words which have not yet acquired definiteness or certainty and which are so general and indefinite that they furnish no such guide, the statute must be declared to be invalid. When it leaves the Legislature a law must be complete in all its terms, and it must be defi-

-nite and certain enough to enable every person, by reading the law, to know what his rights and obligations are and how the law will operate when put into execution. * * * "

This test has heretofore been approved by us in Du'hame v. State Tax Commission, 65 Ariz. 268, 179 P.2d 252, 171 A.L.R. 684.

 Section 2 says that the civil service board "shall supersede any existing State personnel agencies and succeed to their appropriations, records, supplies, equipment and other property." We are very much confused as to what meaning was intended to be given the term "state personnel agency." We have searched the books for a legal definition and find none. "Personnel" is defined by Webster's New International Dictionary, 2nd Edition, as "The body of persons employed in some public service." We presume that a state personnel agency would, therefore, be any state agency which employed a body of persons, such as the State Highway Department, Land Department, Industrial Commission, etc. If that be the correct meaning, the board would take over all records, supplies, equipment, and other property of the State Highway Department, Land Department, Industrial Commission, and all other state agencies that employ a body of persons. Maybe it was intended that the board assume the appropriations and property of only those state agencies that are now operating under the Merit System, such as the Unem-

ployment Compensation Commission and the State Board of Health, but its terms are not so limited, and since the overall attempt was to make a law that covered substantially all state employees, we must assume the civil service board is to succeed to the appropriations, records, supplies, equipment, and property of all state agencies now employing personnel. Of course, we know these agencies have supplies, equipment, and property used in connection with the performance of other functions than the employment of personnel. How are these properties, equipment, and supplies to be apportioned, and who is to decide the apportionment? A statement of the proposition shows the utter confusion that would result, and the impossibility of any intelligent execution of such a provision with no standard or guide provided. Here are drastic and potentially vicious powers given a board with no definition of the limitation of such powers. A power given must be prescribed in terms sufficiently definite to serve as a guide in exercising the power. An obligation is here imposed on all personnel agencies of the state to deliver up their appropriations, records, supplies, equipment, and property. When such an obligation is imposed it must be sufficiently definite to advise with reasonable certainty the agencies, employees, and any other persons affected, of the limits of their obligation. Certainly the mere term does not serve as such a guide. It is true these identical words

are used in what has been referred to as the Michigan law, but the Michigan law from which they were copied was a constitutional amendment, and any intelligent legislature, in passing a law pursuant thereto, would make provision for advising those who have duties and obligations thereunder the extent thereof.

By section 3 the board shall classify all positions in the state civil service, establish rates of compensation, approve or disapprove disbursements for all personnel services, determine qualifications for positions, and make rules and regulations covering personnel transactions in the state civil service. As heretofore noted "state civil service" is declared to consist of all positions in the state service including positions with any board, office, or commission of the state or any political subdivision thereof. Section 7 requires class I counties, and permits all other counties, to establish civil service systems before the law goes into effect. Since we hold that the law cannot constitutionally include all political subdivisions of the state and that if it is to be given any meaning it refers only to the counties coming under the act, then under section 3 the civil service board is given the power to classify, establish compensation, approve and disapprove disbursements for services, determine fitness and qualifications, make rules and regulations, and regulate the conditions of employment of all county employees falling under the system required to be established in class I counties and which may be established in other counties.

To say that all existing laws concerning county employees, fixing their compensation, approving their claims, and determining the conditions under which they work, are to be swept aside, and all powers by law given the board of supervisors and other county officials are to be obliterated by any such nebulous, indefinite, and incomplete attempted legislation, is unthinkable. If this is not the proper meaning to give this portion of the act, then there is no proper meaning which the court can find—either event leading to a blind alley with no law capable of intelligent interpretation or execution. It is no law. At best it is an expression that we should have some kind of civil service law.

Section 5 inferentially gives the personnel officer authority to execute powers given the board. Are his powers concurrent with those of the board? If so, confusion would result. If this were the only defect we would probably say that since he was appointed by the board his authority would be subject to its direction, supervision, and revocation. We suggest, however, that any future legislation should avoid this possible defect. This section also directs the legislature to appropriate not less than 1% of the payroll of the state's service. This means nothing. It is the constitutional duty of the legislature without specific direction to

make all necessary appropriations to pay the expenses of state agencies. There is no legal method of compelling the legislature to act. Such a provision, however, would not kill the bill. It is merely a waste of printer's ink.

Section 7 directs first class counties, and permits the other counties, to establish civil service systems covering "certain" appointive officers and employees. By its use here the word "certain" means "uncertain." What employees? Only the stenographers, or the highway help? Only the county treasurer's employees, or all county employees? What kind of systems are they to establish? Must they follow the pattern established for the state? These are questions any court would have great difficulty in answering. The boards of supervisors have only such authority as is expressly given or necessarily implied by statute. Theirs is a hazardous position. They are personally responsible for the expenditure of public funds beyond such authority. It is therefore necessary that their power and authority be defined with sufficient clarity to enable these boards to know their legal bounds. We recognize the rule that county and municipal corporations may be given legislative authority over local matters, but the law granting such authority must give the county governing boards some reasonable standard or guide whereby they can operate. Vinton v. Hoskins, 174 Or. 106, 147 P.2d 892.

We are urged to say that the act delegates to the civil service board legislative powers. It is axiomatic that neither the legislature nor the people can delegate to an administrative board the power to legislate. Only the people and the legislature may perform this function.

Section 3 gives the board power to "regulate all conditions of employment in the state service." Query: Is the unrestrained regulation of all conditions of employment legislative? The right of the state to regulate conditions of employment is bottomed upon the police power of the state. If inhuman or oppressive employment conditions exist, the state, in the exercise of its police power, may by means of legislation rectify the situation. May the state, in order to accomplish this, transfer to an administrative board the unlimited power to use its judgment and discretion in determining what conditions shall be rectified and how this shall be accomplished? We have no hesitation in saying such is legally impossible. Legislation may pass to administrative boards or officials the right or power to find facts or conditions properly prescribed under which the law as passed will or will not operate, but it may not permit the board to say what the law shall be. For illustration: Safe or sanitary conditions would normally be called for in regulating conditions of employment. Who can say whether employees shall or shall not work under safe or sanitary conditions? Clearly this is a

legislative function. Under the unlimited and unrestrained powers here given, the board can require employees to work in unsanitary or unsafe conditions. Probably they would not, but the constitutionality of a statute must be determined by what can be done under it rather than what might or might not be done. M & M Wood Working Co. v. State Ind. Com., 176 Or. 35, 155 P.2d 933. Hours of labor are a condition of employment. Suppose the board should decide that a day's work should consist of ten hours or five hours instead of eight hours as provided by law. There is nothing to prevent such under the broad powers so given. The board could thus amend or repeal our eight-hour law.

Perhaps in the future we may need a statute covering the subjects of ventilation, sanitation, or other working conditions. If this law is good, the legislature is foreclosed from passing such legislation because the people by this initiative measure have taken the right to legislate thereon and transferred it to the civil service board. If the people desire to pass legislation and thereby foreclose the legislature from acting thereon, that is one thing; but the people cannot transfer this legislative power to an administrative board. The vice of this law is that the framers failed to distinguish between giving the power to legislate and giving the power to adopt rules and regulations to provide for the execution and enforcement of legislation. The powers given an administrative board must, by the provisions of the act, be surrounded by standards, limitations, and policies. Only within such boundaries may the board act. Holgate Bros. Co. v. Bashore, 331 Pa. 255, 200 A. 672, 117 A. L.R. 639; Kellerman v. City of Philadelphia, 139 Pa.Super. 569, 13 A.2d 84; Vallat v. Radium Dial Co., supra; Strain v. Southerton, 148 Ohio S. 153, 74 N.E.2d 69; Young v. Willis, 305 Ky. 200, 203 S. W.2d 5; Gasque, Inc., et al. v. Nates, 191 S.C. 271, 2 S.E.2d 36.

The last three cases cited sustain the laws therein considered because they did have standards to guide the administrative office or board in the exercise of the power. In Holgate Bros. Co. v. Bashore, supra [331 Pa. 255, 200 A. 674], the court struck down the law and said:

"The well recognized prohibition against the delegation of legislative power is a necessary outgrowth of the fundamental theory of the separation of governmental functions which permeates our State and Federal Constitutions alike.

\* \* \* \* \* \*

"The legislature may, however, leave to administrative officers, boards and commissions, the duty to determine whether the facts exist to which the law is itself restricted. *In all such occasions, nevertheless, the legislative body must surround such authority with definite standards, policies and limitations to which such administrative officers, boards or commis-*

*sions, must strictly adhere and by which they are strictly governed.* (Emphasis supplied.)

\* \* \* \* \* \*

"As to the delegation to the Department of Labor and Industry, the only condition precedent to the exercise of this extraordinary power to change the provisions of the statute and make its own law is expressed in the following words: 'Where the strict application of the schedule of hours provided for by this section, imposes an unnecessary hardship and violates the intent and purpose of this act. \* \* \*.' If this condition is found to exist, the statute provides no limit to the exercise of the discretion of the Department with the approval of the Industrial Board to prescribe variations from the schedule of hours laid down in the act. This may be done by means of general rules and regulations which may be made, altered, amended and repealed at discretion. The Department is then free to fix the hours of labor in any industry, group of industries, or in individual cases, without any guide or restraint of any kind; the hours may be shortened to six a day or extended to ten or twelve a day. There is no policy set up, there are no standards, there are no boundaries within which the Department and the Board must exercise their discretion. There are no requirements for hearings, findings of fact with reasons for conclusions, or appeals. There is merely a naked authority given to the Department and the Board to make law by general rules and regulations prescribing variations from the said schedule of hours, and to alter, amend or repeal such rules and regulations. The power to amend or repeal a statute is as much legislative in nature as the power to enact the statute. \* \* \*"

In Kellerman **v.** City of Philadelphia, supra [139 Pa.Super. 569, 13 A.2d 86], we find this expression: "But any legislative enactment which vests in a person or body of persons free of any standard independent of his or their own mind and judgment the power of supplying, or giving force to, or suspending its terms falls beyond the limits of judicial approval evidenced in the foreging authorities, and is unconstitutional as a delegation of the power reposed exclusively in the legislature. \* \* \*"

In the law under consideration, the civil service board could pass all kinds of legislation regulating all conditions of employment without any guide or restraint of any kind; with no standards or boundaries within which it must exercise its discretion.

In spite of the numerous litigants and amici curiae with their voluminous briefs, the court, without the aid of a friend, unearthed another objection to the act. No local or special law may be enacted when a general law can be made applicable. Article 4, part 2, section 19, Arizona constitution. The law under consideration requires class I counties, but

only permits other counties, to establish civil service systems. To justify such a distinction and thereby impose greater burdens on first class counties and grant greater privileges to other counties, there must be a legal basis for the distinction. Waybright v. Duval County, 142 Fla. 875, 196 So. 430; Ex parte Brady, 65 Cal.App. 345, 224 P. 252; Murray v. Board of Commissioners, 81 Minn. 359, 84 N.W. 103, 51 L.R.A. 828, 83 Am.St.Rep. 379. In Waybright v. Duval County, the act made a civil service law operative in counties classified on the basis of population. In holding it to be a local or special law, the court said [142 Fla. 875, 196 So. 432]:

"The civil service scheme is of comparatively recent origin and is a progressive step in the government of public affairs. Why it should be adaptable or practical in a county of one hundred sixty-five or one hundred seventy-five thousand inhabitants and of a lesser value or usefulness in one of one hundred sixty or one hundred ninety thousand persons is so difficult for us to understand that we entertain a reasonable doubt of its validity. * * *"

In Ex parte Brady, supra [65 Cal.App. 345, 224 P. 254], the legislation in establishing the sites for sessions of the superior court away from the courthouse made it applicable only to first class counties containing a certain population, and located at certain distances from the courthouse. Held a special law, using this language: "The statute here does not purport to affect all the people, nor all the counties of the state, but concerns counties of the first class only, and a proper inquiry in that regard is whether or not the Legislature was warranted in making such a classification. While a great deal of latitude is rightly accorded legislative acts and the presumption of legality should obtain, nevertheless an arbitrary classification, or one based purely upon whimsical or fanciful reasons, is not a compliance with the constitutional mandate; but it is well settled that wherever the distinction is one for which the Constitution expressly provides, or is one which on its face appears to be perfectly obvious, or is yet one for which there is some substantial reason for its existence, the constitutional provision is not violated. As has been frequently said by our Supreme Court, the distinction must rest on either a constitutional, or a natural, or an intrinsic difference."

■ The only classification of counties which we have is for the purpose of fixing compensation, and the basis thereof is the assessed valuation of properties therein. Section 12-703, A.C.A.1939. Of necessity this is the classification which must be applied. We take judicial notice of county classification and the populations thereof according to the 1940 United States census. Greenlee County, population 8,689, and Maricopa County, population 186,193, are class I counties; Yuma County, population 19,326, is class II; and Navajo, popu-

lation 25,309, is class III. The net result is that Greenlee County, which ranks thirteenth in population, and Maricopa County, which ranks first, are compelled to have civil service, while Navajo, Yuma, and other counties, with much greater population then Greenlee, are exempt. In other words, whether they shall or shall not be required to establish civil service depends upon the assessed valuation in the respective counties. Why the employees of a wealthy county with small population are entitled to civil service, and those of a less wealthy county with greater population are not, is hard to fathom. The assessed valuation of a county can have no possible bearing upon the granting or withholding of the right to security of position through civil service. Such a distinction is arbitrary and furnishes no legal basis for classification.

There is another question raised concerning the title of the act which we think should be discussed. At the time the secretary of state furnishes the clerks of the boards of supervisors of the several counties a certified copy of the names of state candidates to be placed on the ballot, he shall also furnish a certified copy of "*the* titles and numbers of the several measures." Section 60-106, A.C.A.1939. The Supreme Court may take judicial notice of the records of the secretary of state, Schoenburg v. Klapperich, 239 Wis. 144, 300 N.W. 237; Riggs v. Brock, 208 Ark. 1050, 189 S.W.2d 367, and it appears therefrom that in certifying this measure the secretary of state submitted the title as follows: "Relating to Civil Service; Establishing Civil Service Board and Providing for the State and Class One Counties Participation."

This is an abbreviation of the actual title of the bill as proclaimed by the governor to be the law. The secretary of state assumed the privilege of certifying a mere digest of the title instead of the whole thereof, and the people voted upon it as thus submitted. Our constitution directs that every act shall embrace but one subject, which subject shall be expressed in *the* title, article 4, part 2, section 13; requires that each sheet containing signatures of petitioners to initiative petitions "shall be attached to a *full* and *correct* copy of *the title* and text of the measure," article 4, part 1, section 1, subdivision (9); and provides that when an initiative or referendum petition is filed with the secretary of state he shall cause to be printed on the ballot "*the title* and number of said measure, together with the words 'Yes' and 'No' in such manner that the electors may express at the polls their approval or disapproval of the measure." Article 4, part 1, section 1, subdivision (10).

In our opinion these provisions clearly demand that the full title of the bill as appears on the petition be certified by the secretary of state, and the secretary of state had no power nor authority to certify some condensation thereof as the

secretary might think adequate. The fact, however, that the secretary of state misjudged his legal duty in this respect does not necessarily mean that this law may be attacked at this time upon such ground.

■■■■ There is a line of authorities adhering to the rule that an enrolled bill imports verity, and it is conclusively presumed that the constitutionally prescribed details of legislative procedure leading to its passage and enrollment have been complied with. 50 Am.Jur., Statutes, section 149. Arizona has adopted this rule and made it applicable to initiative and referendum measures. Allen v. State, 14 Ariz. 458, 130 P. 1114, 44 L.R.A.,N.S., 468; Renck v. Superior Ct. of Maricopa County, 66 Ariz. 320, 187 P.2d 656. We do not condone but rather condemn the failure of the secretary of state to follow strictly the constitutionally prescribed procedure herein; but after a statute has been passed by a vote of the people and promulgated as the law, this court's sphere of inquiry is and should be whether the law iself in its final form is constitutional as to its provisions, and not whether there was a constitutional defect in the proceedings leading to its final passage. The act as initiated and proclaimed by the governor is the act that the court will examine in determining its constitutionality, and at this time, consonant with the rule herein announced, we refuse to give legal effect to the procedural defect. There was a time to raise procedural questions, but it was before the votes were cast and not after the law had been proclaimed to be the law of the state.

We hold, therefore, that the civil service act is not unconstitutional for the reason that the secretary of state, in certifying the same to the boards of supervisors, abbreviated the title, but we do hold that the act is unconstitutional in its entirety for the following reasons:

(1) It includes political subdivisions of the state other than counties without reference thereto in the title.

(2) It invades the constitutional powers of the board of regents by granting partial supervision of state educational institutions to the civil service board.

(3) It is indefinite, uncertain, and incomplete to the extent that it is incapable of intelligent enforcement.

(4) It delegates legislative powers to the civil service board.

(5) It is a special law, when a general law could be made applicable, without a legal basis for legitimate classification.

UDALL, STANFORD and PHELPS, JJ., concur.

Note: Justice DeCONCINI having announced his disqualification, the Honorable DUDLEY W. WINDES, Judge of the Superior Court of Maricopa County, was called to sit in his stead. While Chief Justice LaPRADE actively participated in

260

the determination of all issues raised by this appeal, his illness has delayed the preparation of this opinion.