[Civil No. 3767. Filed April 12, 1937.]

[66 Pac. (2d) 1035.]

BOARD OF EXAMINERS OF PLUMBERS, of the City of Phoenix, Arizona, and RAY L. NELLIS, CARL W. MISKIMEN and ARTHUR W. KNAPP, Members of the Board of Examiners of Plumbers, and CITY OF PHOENIX, a Municipal Corporation, Appellants, v. S. J. MARCHESE, Appellee.

Mr. Frank H. Lyman, former City Attorney, Mr. Richard F. Harless, his Assistant; Mr. I. A. Jennings, present City Attorney, Mr. Hess Seaman and Mr. J. V. McCrory, his Assistants; (Mr. Frank Hotchkiss, of Counsel), for Appellants.

Mr. George M. Sterling and Mr. V. L. Hash, for Appellee.

LOCKWOOD, J.—This is an appeal by the Board of Examiners of Plumbers of the City of Phoenix, hereinafter called respondents, from a judgment of the superior court of Maricopa county, in favor of S. J. Marchese, hereinafter called petitioner, directing respondents to issue to petitioner a master plumber's license for the City of Phoenix, for the year 1935. The peremptory writ was issued on the 9th day of Decem-

ber, 1935, and respondents on the 16th day of December of that year complied with the order, but filed a motion for new trial. This was taken under advisement by the court, and on March 2, 1936, overruled, whereupon this appeal was taken within a short time.

Respondents in due time filed their abstract of record and opening brief in this case, but petitioner has never filed any brief on the merits of the case; his sole pleading in this court being a motion to dismiss the appeal on the ground that the question involved therein has become moot. His petition in the original action was for the issuance to him of a plumber's license for the year 1935, and the judgment of the court was for a peremptory writ of *mandamus* requiring the issuance of the license for that year. By the time the motion for new trial was overruled and the appeal taken, the license for the year 1935 had, by its terms, expired, and he applied for a license for the year 1936, under the provision of the ordinance to the effect that all annual licenses might be renewed on application within thirty-one days after they had expired, upon the filing of an application therefor and tendering of the annual license fee of $10. Respondents issued it as requested; the same process was repeated in January, 1937, and he is now operating under a 1937 license.

Respondents, on the other hand, while admitting that the 1935 license issued under the writ of *mandamus* had expired by operation of law and that petitioner is now operating under a 1937 license, contend the case is not moot, for the reason that the 1937 license is dependent upon the validity of the 1935 license which was questioned in the original proceeding, and that if this court should determine that the latter was not legally issued, the 1936 and 1937 licenses would automatically become void.

■■ The question of whether an appellate court should pass upon the merits of a case which has be-

come moot, to a great extent, is discretionary. If, although the effect of the particular judgment questioned may have ceased, the principle involved therein is a continuing one, courts will sometimes consider the original case in order to avoid a multiplicity of appeals. We think the principle involved herein is well settled in the case of *Technical Radio Laboratory* v. *Federal Radio Com.,* 59 App. D. C. 125, 36 Fed. (2d) 111, 113, 66 A. L. R. 1355, in the following language:

"It is argued on behalf of the commission that this appeal presents a moot question because of the fact that the commission may not issue a license for a longer period than three months, and that, if the Commission had issued the renewal license which appellant applied for, such license would long since have expired according to its own terms. It is argued that, since the period for which the license might have been issued has expired, this appeal has become moot, and should be dismissed. We do not agree with this contention. Such an interpretation of the act would practically nullify the right of appeal granted by Congress in such cases, for it is rarely possible for a station to secure a decision upon such an appeal within three months after the right of appeal accrues. This fact was of course well known to Congress when the statute was enacted. Moreover the relief sought by an applicant for renewal is not limited to the issue of a license for three months only, but includes a continuing right to apply thereafter at proper times for successive renewals thereof. The statutory appeal accordingly contemplates the restoration to the appellant, if his claim be sustained, of the continuing right to make such application to the Commission as he would have enjoyed had his application first been allowed. We feel justified therefore in entertaining the appeal."

The same situation, in substance, arose in *Southern Pac. Terminal Co.* v. *Interstate Commerce Com.,* 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310, and the same principle was applied. We have determined, therefore, to consider the case on its merits, notwith-

standing the fact that the specific license issued by the terms of the writ of *mandamus* has expired.

The factual situation is as follows: In the year 1928 the City of Phoenix adopted Ordinance No. 1224, which was entitled,

"An ordinance . . . regulating plumbing and prescribing conditions under which the business and vocation of plumbing may be carried out in the City of Phoenix . . . "

This ordinance, so far as material to the consideration of this case, reads as follows:

"Section 1. (1) No person shall, in the City of Phoenix, engage in the business of plumbing, either as a master plumber or as a journeyman plumber, unless such person shall have first been licensed as hereinafter provided for."

"(3) Every person desiring to engage in the business of plumbing as a master plumber shall first make application to the Board of Examiners, and shall at such time and place as the Board may designate, undergo such examination as to his qualifications and competency to engage in such business as the said Board shall direct."

"(6) All master plumber licenses issued during any year, unless sooner revoked, shall expire on December 31st, of such year, and all bonds hereafter posted, as hereinbefore required, shall expire on December 31st unless sooner revoked."

"(8) A license once issued under this act to a master plumber may be renewed at any time during the month of January in the year following its issuance upon the payment of a Ten Dollar ($10.00) renewal fee provided that a six months' continuous cessation of actual business by any master plumber in the City of Phoenix, shall automatically revoke the license under which he may have operated."

"(10) All master plumbers actually engaged in business as such at the time this act goes into effect may within thirty days thereafter, procure a license without examination upon payment of the license fee herein required. All persons applying after the ex-

piration of said thirty days for a license, shall be required to take the examination herein provided for.''

The effect of these provisions may be stated briefly as follows: All persons who desired, after the passage of the ordinance, to engage in business as master plumbers in the City of Phoenix were required to take out an annual license therefor, paying a fee of $25, and taking an examination as to their qualifications and competency to engage in the business. After a license was once issued to a master plumber, he might renew it during the month of January succeeding the year in which it was first issued by paying an annual license fee of $10 in advance. The only exception to the taking of the examination required by the ordinance, as a condition precedent to an original license, was that all master plumbers who were actually engaged in the plumbing business at the time the ordinance went into effect, might receive their license without examination during the first thirty days, but all persons who applied after the expiration of such thirty days were specifically required to take the examination provided by the ordinance. In other words, special privileges were granted to old master plumbers for the first thirty days after the ordinance became effective, but after that time all were treated alike. The petitioner herein had been in the plumbing business for a number of years in the City of Phoenix prior to 1928, and applied within the thirty days specified in the ordinance for a license without examination. This license was duly issued to him, and was renewed according to the terms of the ordinance until and including the year 1933. On December 31st of that year the license under which petitioner was operating expired, and he did not make application for a renewal thereof during the month of January, 1934, nor was it renewed by the board. He did, however, make application for such renewal on the 5th day of February, 1934, alleging

as an excuse for his delay of five days that he had been over at the coast and did not get back until the time when he made his application. The board then refused to grant a renewal of license unless and until he applied for and took the examination required by the ordinance. It appears that ever since that time the petitioner has been ready, willing, and anxious to pay the fee required by the ordinance, but has declined to take any examination as provided thereby, while the respondents have at all times been willing to issue him his license upon the satisfactory passing of the examination required by the ordinance of master plumbers and the payment of the license fee.

The question before us then is whether or not, under the terms of the ordinance and the facts, a master plumber whose license for the preceding year has expired, and who has not made an application for a renewal within the month of January following, is required as a condition precedent to the receiving of a new license, not only to pay the license fee required by the ordinance, but also to stand an examination as to his qualifications as a master plumber.

▮▮ The business of plumbing, as generally regarded now, is one which requires supervision by municipal authorities, and it is also generally accepted that this supervision may extend to a reasonable examination as to the qualifications of those desiring to engage in the business, and the payment by such applicants of a reasonable license fee. In *Ex parte Smith*, 231 Mo. 111, 132 S. W. 607, 609, the court said:

"While there may be some cases to the contrary, the great weight of authority in this country is to the effect that the business of plumbing is so intimately connected with the public health, especially in large centers of population where scarlet fever, typhoid fever, diphtheria, and other diseases are apt to become epidemic, as to be the proper subject of police regulation. [Citing cases.] The right of a citizen under

our Constitution to follow any legitimate business, occupation, or calling which he may see fit to engage in and to use such right as a means of livelihood, is fully secured, but it is subject to the paramount right of the state to impose upon the enjoyment of such a right a reasonable regulation which the public welfare may require. In *People* v. *Warden of the City Prison*, 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718, it is said: 'We know that important plumbing work calls for plans and designs, and requires skilled supervision. It is some guaranty of these requirements being met that the plumber, employed upon the particular work and who must employ plumbers and assistants in carrying out the work engaged upon, is competently certified, and, therefore, held up to be skilled and capable in his business. The layman in his ignorance is obliged to put some trust in the plumber he engages; for the plumber's work is not only one calling for the exercise of skill, but it is done in places which are dark or more or less inaccessible. The Legislature in creating a system by which the qualification of plumbers, who propose to have work performed by others under their direction, as it seems to me aids the citizen, in an important degree, in placing his confidence, and furnishes some safeguard against the performance of bad and unsafe work. That the men employed by the master plumber may prove untrustworthy in practice, or may neglect the work committed to them, certainly can furnish no ground for attacking the purpose of this statute; for the presumption and the natural probability are the other way, that a master plumber, who has been certified by the board, will exercise care in the selection of his employees, and that he will be competent to see and correct their faults and omissions. Every reason, in my opinion, which bears upon the citizens' comfort and health demands that we sustain this statute as a step in the right direction.' "

In *State* v. *Gardner*, 58 Ohio St. 599, 51 N. E. 136, 137, 41 L. R. A. 689, 65 Am. St. Rep. 785, the following language was used:

"True it is that the business of the plumber is not ranked with the learned professions, and that much of his work is mechanical merely, calling for the exer-

cise of deftness of the hands rather than the possession of scientific knowledge. Yet a certain degree of training and experience is absolutely necessary to render one intelligent as to the groundwork of his calling as well as competent and skillful in its exercise. He is required to put into our dwellings and public buildings tanks, pipes, traps, fittings, and fixtures for the conveyance of gas, water, and sewage, which require. among other essentials, the keeping out and protection against gases which are destructive of health, and not infrequently of life itself. That it is of the highest importance that the drainage and sewerage of our public buildings and private tenements should be as skillfully planned and executed as the modern standard of science admits would seem not to be open to question. And surely it is reasonable to suppose that one who has been educated to understand the scientific principle necessarily involved in work of this character, and to comprehend the reasons and teachings of experience upon which it is based, and the evil results which may follow neglect to observe it, will be more likely to provide the needful safeguards than one who is ignorant upon the subject.''

Further quotations or citations would be superfluous. The general principle is clearly established.

 The ordinance in question, if reasonable in its terms, is therefore constitutional, for the charter of the City of Phoenix gives almost unlimited powers to that city in regard to the regulation of plumbing. The question then is: Are the regulations set forth in the ordinance reasonable? Those involved in the present action are in substance two: (a) The taking of an examination to determine the fitness of the applicant, and (b) the payment of a license fee of $25 for the first year, and $10 for each succeeding year. So far as the examination required by the ordinance is concerned, we think it plain that it is not only a reasonable but, indeed, a necessary provision, since the whole basis of the exercise of the police power is that the public health and safety require that work of the na-

ture of plumbing be done by men who are sufficiently skilled in that line, and the best and, indeed, the only way in which the city may determine as to the skill of the applicants for license is that they take a proper examination as to their qualifications. This is, indeed, the usual course for applications for permission to engage in any occupation requiring unusual skill. Law, medicine, electrical work, and many other occupations all require some form of examination as a condition precedent to engaging therein. So, too, in regard to the payment of a reasonable license fee. The cost of the giving of examinations, the issuance of licenses, and the keeping of records thereof involve a certain amount of expense to the city, and a regulatory license fee is permissible, both by the terms of the charter and by the general provisions of the law of Arizona. It is true that we have said in the case of *City of Tucson* v. *Stewart,* 45 Ariz. 36, 40 Pac. (2d) 72, 96 A. L. R. 1492, that the fee cannot be so great as to amount to tax for revenue, rather than a regulatory exactment, but in the present case we think the limit has not been exceeded. It seems to us that the only plausible argument which may be urged by petitioner in favor of his right to be exempt from examination is that since he was once given a license as a master plumber without examination, he is now entitled to have one for the balance of his life free from such restriction. We are of the opinion that this is not a constitutional right of the applicant. In the first place, the ordinance might properly have required an examination even of men who had been in the plumbing business for many years, as a condition precedent to the issuance of any license, for the mere fact that a man has, without examination, followed an occupation for many years, although it may be accepted as *prima facie* evidence that he is sufficiently qualified to continue so to do, is by no means conclusive to that effect.

There are many, in almost every occupation, who are totally unfitted to follow it, even though they have "practiced" on a helpless or unsuspecting public for many years. The concession made by the ordinance under which petitioner obtained his first license is a matter of grace and not a matter of right, and we see no reason why the ordinance might not have required periodic examinations, had the authorities so desired, of every applicant for a renewal of a license. The case of *State* v. *Williams,* 297 Mo. 607, 250 S. W. 44, 45, is practically on all-fours with the present one, so far as the legal principles involved were concerned. In that case the petitioner had allowed the time permitted by the statute for a renewal of his license to practice embalming to pass, and when he did make application was told, as in the present case, that he must take the regular examination required of all original applicants. The court said:

"It is conceded that the relators' license expired on the 30th day of April, 1922. They were required under the statute (section 5304, *supra* [Mo. St. Ann. § 13541, p. 3953]) to make application for a renewal of same before its expiration. This they did not do. Whether the board formally annulled the license after its expiration is immaterial. It was thereafter, so far as it was able to confer any power upon or invest the relators with any privilege, as inert as the dust 'in the tombs of all the Capulets.' This being true under section 5303, *supra* [Mo. St. Ann. § 13540, p. 3952], relators were required to make written application to the board accompanied by the required fee, present themselves before it, and, if upon examination they were found to possess the qualifications required, they were to be licensed as embalmers."

And in passing upon the question of the right to require a re-examination, it continued:

"It is a mistaken conception of the nature of any calling, professional, commercial, or industrial, that it is invested with such sanctity as to exempt it from

reasonable legal regulations. The ever-expanding exercise of the police power manifested in the enactment of regulatory statutes, embracing every possible vocation, demonstrates the fallacy of this conception. The purpose of such statutes is in some instances to encourage efficiency and in others to promote sanitation, whereby in the first incompetency may be eliminated and in the second the public health preserved.

. . .

"A re-examination of one who has permitted his license to expire is not an oppressive requirement or an invasion of his inherent right. It affords the board an opportunity to determine whether, under that feeling of security afforded by a license renewable upon a mere application, the applicant has not become inefficient through mental inertia."

We think the argument set forth in that case is unanswerable. We hold, therefore, that when petitioner failed, through no fault of the respondents, to apply for a renewal of his license in the month of January, 1934, all rights of renewal expired automatically, and respondents were then without jurisdiction to renew his license upon any conditions, or to grant him an original license except upon the terms set forth by the ordinance, to wit, an application in the same manner as any other person who had never been issued a license. This he refused to make, and respondents properly refused to issue him a license. The judgment of the superior court granting the writ of *mandamus* was necessarily wrong, and it follows from what we have said that the re-issuance to petitioner of licenses for the years 1936 and 1937 was not only not required of respondents but was not permitted to them.

The judgment of the superior court of Maricopa county is reversed, and the case remanded, with instructions to quash the writ of *mandamus* heretofore issued.

McALISTER, C. J., and ROSS, J., concur.